**In re KENTUCKY ELECTRIC POWER CORPORATION.**

District Court, W. D. Kentucky.
Aug. 12, 1935.

Ritchie, Janney, Ober & Williams, of Baltimore, Md., and Crawford, Middleton, Milner & Seelbach, of Louisville, Ky., for petitioners.

**HAMILTON, District Judge.**

This action is pending before the court on the petition of the law firm of Ritchie, Janney, Ober & Williams, Baltimore, Md., attorneys for the bondholders' committee, for an allowance of an attorneys' fee of $20,000 and expenses of $918.89; petition of Crawford, Middleton, Milner & Seelbach, Louisville, Ky., attorneys for the debtor, for an allowance of $5,000; and petition of Moncure Biddle, J. C. M. Lucas, and Charles B. Roberts III, bondholders' protective committee, for an allowance of $12,000, $4,015.94 of which has heretofore been paid (without the approval of the court), and in addition the committee requests an allowance of $4,473.68 for expenses incurred.

The attorneys for the bondholders' protective committee set out as a basis for their charge for services substantially the following facts:

The committee was formed in June, 1932, and immediately employed the firm of Ritchie, Janney, Ober & Williams to represent it. The attorneys immediately prepared a bondholders' deposit agreement in the customary form, and made an investigation of the liability for stamp taxes under the internal revenue laws in the exchange of bonds for certificates of deposit under the deposit agreement, and as a result of this investigation advised the committee to change their plan of deposit to an outright assignment of the bonds to the committee, which was done. The attorneys also supervised, considered, and approved letters and statements mailed by the bondholders' committee to the debtor's creditors.

At the time the bondholders' committee was formed, the company had defaulted in the payment of interest and amortization requirements for the retirement of the bonds, and the company was required to raise additional capital to finance the construction of transmission lines. Cash was also required to meet pay roll expenditures.

The bondholders' committee, together with the attorneys, held six meetings during July, August, and September, 1932, and as a result of these meetings, the committee and the attorneys worked out plans for procuring additional capital. The attorneys prepared forms for assignment of accounts and a pledge of deposited bonds to secure loans, and prepared for the corporation necessary resolutions for the borrowing of money from banks and assignments to the lenders of accounts receivable and the pledge of the company's bonds that had been deposited with the committee. As a result of the efforts of the committee and the preparation of the papers by their attorneys, $17,448.63 was borrowed.

The company has from the date of its incorporation operated a power plant, disposing of power wholesale under contract with the Kentucky Utilities Company. This contract was about to expire and it appeared that probably it could not be renewed. It was, therefore, necessary for the company to acquire franchises and build distributing lines. The bondholders' committee prepared to do this, and the attorneys advised them what legal steps to take to accomplish it. However, because of an injunction, this plan was not feasible, and it became necessary to negotiate a new contract, which was made possible by reason of the co-operation of the bondholders in providing money in order to keep the corporation alive, even to the extent of entering the independent distributing field. The committee and its counsel negotiated a contract with the Kentucky Utilities Company for the purchase by it of all the power produced by the company at its plant. Several conferences were held in Kentucky, with the utilities company, before this contract was completed, which required the committee and its counsel to leave their places of business in Baltimore and come to Kentucky. Also, there was much correspondence between the representatives of the Kentucky Utilities Company in Kentucky and the committee and its counsel in Baltimore, Md.. The contract as originally drawn provided that it should be terminated at the option of the Kentucky Utilities Company, if the Kentucky Electric Power Corporation, the debtor herein, became bankrupt or was placed in receivership. This provision of the contract was a barrier to a reorganization of the company or bankruptcy proceedings. The committee and its counsel commenced negotiations to obtain a modification of the contract in this particular which was accomplished in July, 1933, whereby the Kentucky Utilities Company agreed to waive this provision of the contract provided 75 per cent. of the bonds of the company were deposited with the committee and retained by it. The re-

quired amount of bonds having been deposited, the committee's counsel prepared the petition filed in this action for a reorganization under the provisions of section 77B of the Bankruptcy Act, 11 USCA § 207.

The committee and counsel examined and considered all contracts existing between the debtor and others, prepared the plan of reorganization, submitted it in writing to the bondholders and counsel for the committee, and some members of the committee attended several hearings before this court at Louisville, Ky. The committee's counsel prepared the charter and by-laws and attended to the organization of the new corporation, which acquired the assets of the old corporation under the judgment and orders of this court." Committee's counsel prepared the mortgage indenture between the Kentucky Electric Power Company (the new corporation) and the Baltimore National Bank, trustee for the bondholders. Petitioners' counsel spent approximately 1,500 hours on these matters.

On the filing of the petition in this action, this court on January 22, 1935, appointed the law firm of Crawford, Middleton, Milner & Seelbach as counsel for the debtor, the Kentucky Electric Power Corporation. Thereafter, said attorneys represented the debtor in these proceedings.

The company's counsel critically examined all pleadings, the plan of reorganization, the draft of letter to the bondholders, notifying them of the plan, arranged for an appraisal of the properties of the company, and held numerous conferences with counsel for interested parties; prepared and presented to the Kentucky Utilities Commission the proposed plan of reorganization and attended several hearings before the court on matters connected with the reorganization, spending a total of 151 hours on these matters.

The debtor in this action had immediately before it was instituted assets of the book value of $2,648,413.28, and had outstanding $107,755.55 of debenture notes, $1,100,000 first mortgage bonds, $400,000 of ten-year debenture notes, $500,000 par value preferred stock, and $1,000,000 of common stock. The reorganization plan approved in this action has reduced the book value of assets approximately $1,878,413.28.

The attorneys representing both the debtor and the bondholders' committee possess learning and ability and are outstanding in their profession. However, it is the duty of the court to carefully protect the rights of those who must ultimately pay the allowances herein granted.

Section 77B of the Bankruptcy Act, 11 USCA § 207, provides that the court "may allow a reasonable compensation for the services rendered and reimbursement for the actual and necessary expenses incurred in connection with the proceeding and the plan by officers, parties in interest, depositaries, reorganization managers and committees or other representatives of creditors or stockholders, and the attorneys or agents of any of the foregoing and of the debtor, but appeals from orders fixing such allowances may be taken to the Circuit Court of Appeals independently of other appeals in the proceeding and shall be heard summarily."

The court is faced with an unpleasant and delicate task in fixing reasonable allowances in proceedings under section 77B. Usually, as in this case, no one objects to or protests the amounts of such allowances as requested by counsel and committee. The court must, therefore, independently pass on the question unaided by counsel for opposing parties.

The members of the bar have a greater personal interest in the allowance of reasonable fees than any one else. Bishop Burnet in his "History of Our Own Times" said, "The law of England is the greatest grievance of the Nation, very expensive and dilatory."

Exorbitant fees cause the people to set up bureaus in the executive branch of the government to pass on their rights and to formally approve and supervise corporate reorganizations and the issue of securities. Much is said by members of the legal profession about bureaucracy and the intrusion of the executive branch of the government into the judicial field. If the courts were more prompt in disposing of matters brought before them, and attorneys were less eager to receive exorbitant fees, the cry against bureaucracy would not be so blatant and the Legislatures would not be so often importuned by members of the bar to pass acts defining the practice of law, and prohibit-

ing the layman from invading the legal field.

All deeds of conveyance were one time written and prepared by lawyers. This was likewise true of wills. The charges of the lawyers for these services drove the layman to either prepare his own deeds or wills, or hire another layman to prepare them for him.

The exorbitant fees allowed by courts to lawyers and excessive allowances to receivers in the federal courts have so aroused litigants as to cause the Congress to appoint a committee to investigate the courts of the land. Section 77B provides a simple and convenient method for the reorganization of financially distressed corporations. The salutary benefit of this act will be destroyed, and it will become a disused statute unless the judges of the federal courts carefully scrutinize the claims of attorneys and committees for allowances for services and allow only reasonable fees based on services rendered.

There has been no contest of any kind over the proceedings in this action. The plan of reorganization was simple, and while the attorneys for the committee have spent a great deal of time in considering the affairs of the debtor, most of the time was consumed on work that did not contemplate a reorganization.

In the administration of the bankruptcy law, it is the policy of the courts to keep the administration expenses to the minimum, and unless this is done, the purpose of the act will be defeated. Economy is strictly enjoined, and this policy should always be adhered to by the courts and the attorneys.

In determining reasonable compensation for the attorneys in this case, I am taking into consideration their excellent character, ability, and experience. They have performed their duties well.

The court in the case of Frink v. McComb (C. C.) 60 F. 486, 489, said: "There is no standard by which the compensation of counsel can be properly and definitely determined as to amount. The question, when presented at this time, must be decided upon considerations as vague and indefinite as when it was said· in the Mirror (chapter 2, § 5) that 'four things are to be regarded: (1) The greatness of the cause; (2) the pains of the serjeant; (3) his worth, as his learning, eloquence, and gift; (4) the usage of the court.' "

The Second Circuit, in Re Consolidated Distributors, Inc., 298 F. 859, 863, said:

"In the case In re Curtis, 100 F. 784, 785, 41 C. C. A. 59, 60, the Circuit Court of Appeals for the Seventh Circuit cut down an allowance to the attorneys from $12,500 to $2,000, and in doing so said: 'We have searched this record with care, that we might arrive at just judgment with regard to the amount that should be allowed for the service rendered. We have been solicitous to award full reasonable compensation, but careful to withhold inordinate allowance. We reach the conclusion that an allowance of $2,000 fully compensates the service. We have doubted if this be not too large a sum. We are not unmindful of the dignity of the profession, nor forgetful of the important duty of counsel. We would not underrate that duty. We would magnify his office. For exacting labor done, weighty responsibilities assumed, and great results accomplished, we would deal out compensation with a liberal hand. We think, however, that the dignity and honor of the profession are not conserved, or its influence for good promoted, by excessive allowance for service. That would lend countenance to the suggestion, sometimes heard, that the commercial spirit of the age has invaded even the legal profession, to the impairment of its dignity, the blunting of its sense of honor; that a profession instituted for the maintenance of justice has become degenerate, and that its main calling now is a vulgar scramble for the "almighty dollar." We cannot bend our judgment to lend sanction to a foul aspersion.'

"We find ourselves in entire sympathy with the statement which we have quoted. The administration of the Bankruptcy Law is to be conducted primarily for the benefit of the creditors of a bankrupt's estate, and that is and ought to be the policy of the law. Any different policy would discredit the law itself and the courts. We have no doubt that the District Judge was conscientious in fixing the amount of compensation he allowed the attorneys in this case. He would not intentionally lend himself to extravagance and injustice, and we think he was in error, and that his conclusion was founded in a misconception of the ground up-

on which the allowance was to be based. In our opinion, under the circumstances disclosed, the allowance of $5,000 is unreasonable compensation to the attorneys for the service they rendered to the bankrupt's estate."

■ The usual guidepost for fixing attorneys' fees is absent in this case. There was no recovery of any sum for creditors. There was a scaling down of the corporate structure and some classes of creditors lost their entire claim. I have concluded in view of all the facts that the attorneys for the bondholders' committee are entitled to receive a fee of $7,500 and $918.89 expenses; the attorneys for the debtor, a fee of $1,500.

■ The committee for the bondholders relies on the statement of its counsel for proof of its work performed and the allowances asked. It is a little difficult to tell from the record just what was done by the committee independently of its attorneys. Its chairman, Mr. Moncure Biddle, claims his services were worth $7,000, and his associates $2,500 each. While the committee was acting, the debtor corporation continued its active business and paid salaries to its executive officers. Its board of directors continued to function, and this court did not disturb the management of the corporation during the pendency of this action. The bonds of the company were owned by approximately 300 individuals and corporations. It had deposited with it approximately 84 per cent. of the entire bonds outstanding. No commissions were paid to any one for getting bonds deposited.

In letters mailed to the owners of the bonds seeking deposits with the committee, no statement was made that the committee intended to charge for its services. Under these circumstances the court should exercise the utmost care in making any allowance whatever to the committee. In fact, it would be a wholesome rule for courts to adopt, to make no allowances to bondholders' committees under section 77B of the Bankruptcy Act, unless the committee in its formation and requests for the deposit of bonds or securities advised the depositors that it expected to be remunerated for its services. However, in view of the fact that no such rule has been adopted by the

courts, I do not feel justified in applying it to this case.

Some of the facts on which the committee relies for an allowance, such as the negotiation of the contract with the Kentucky Utilities Company, and its modification, are properly within the province of the board of directors, and should have been handled by them.

The Bankruptcy Act contemplates that allowances for compensation shall only be made for services rendered in connection with the proceeding for the reorganization, and I do not believe this court has jurisdiction to allow compensation for services rendered in matters collateral to or indirectly affecting the proceedings.

The bondholders' committee has approved an allowance for its members of $12,000, and also an allowance of $20,000 for its attorneys. I find myself unable to act on the recommendation of the committee, and have reached the conclusion that the total allowance to the committee should be as follows:

| | |
|---|---|
| Moncure Biddle, Chairman | $3,500.00 |
| J. C. M. Lucas | 1,250.00 |
| Charles B. Roberts III | 850.00 |
| | $5,600.00 |

Mr. Biddle has been paid without the approval of the court $3,215.94, which leaves a balance of $284.06 due him. Mr. Iredell W. Iglehart, a former member of the committee, now deceased, was paid before his death $800, without the approval of the court. This allowance is approved to the extent of $400.

The secretary of the committee, Mr. Robert L. Randolph, is allowed $1,500, credited by $250 heretofore paid to him by the committee without the approval of the court.

The committee has furnished the court inadequate supporting evidence of its expenses, but probably it is sufficient for the court to approve the amount requested of $4,473.68, which is done.

■ In future cases this court will not approve allowances of compensation to committees for stockholders, creditors, or bondholders, where voluntarily formed, unless the committee in writing, when soliciting the deposit of bonds or stocks or assignment of claims, advises that it expects to charge for its services.