**WATTERS et al. v. HAMILTON GAS CO.**

No. 2889.

District Court, S. D. West Virginia, at Charleston.

Sept. 1, 1939.

442

J. E. Campbell and Arthur S. Dayton, both of Charleston, W. Va., for trustees.

All the lawyers applying for allowances for themselves or committees, for respondents.

McCLINTIC, District Judge.

This proceeding is before the Court upon application for various allowances to Committees, attorneys and others with respect of the Hamilton Gas Company.

That corporation was chartered in 1927 under the laws of Delaware, and admitted to do business in the State of West Virginia, where it owned a large number of oil and gas properties. It also owned all the capital stock of certain subsidiaries.

The total record embraces many thousands of pages of pleadings, exhibits and testimony, not taking into consideration the numerous petitions and briefs; statements as to certain phases of it will be found in an opinion by this Court reported in 10 F.Supp. at page 323.

It is not necessary to make more than a general statement of the course of this litigation.

In January, 1932, there was filed in Delaware an application in equity for a receivership of the Company; followed immediately by the filing on January 18, 1932, of the ancillary equity cause in this Court of Clarence L. Harper and Arthur Peck, partners trading as Harper & Turner, against the Hamilton Gas Company. The bill was a typical receivership proceeding, alleging that the defendant corporation had outstanding $2,325,500 of First Mortgage 6⅛% Sinking Fund Gold Notes, and $756,000 of debenture bonds, and current obligations in excess of $300,000, and, while solvent, was unable to pay its debts.

On January 18, 1932, the Delaware Court appointed Alex F. Crichton and William A. Larner, Receivers. On the following day, a decree was entered by this Court taking ancillary jurisdiction of the assets and property of the defendant within its jurisdiction, A. F. McCue, B. A. Wise, and William J. Maier, being appointed, Mr. Maier later resigned as Receiver, the other two named serving throughout the litigation.

Ancillary proceedings were also commenced in Kentucky.

All of the physical properties of the Company, except certain office furniture and tangible property of little value, are located in West Virginia and Kentucky, much the greater part being in the former state.

Under date of July 29, 1932, Clarence L. Harper, Samuel McCreary, John H. Smaltz and Louis J. Groch filed a petition, setting out an agreement entered into as of February 1, 1932, whereby they agreed to act as a protective committee to represent owners of the First Mortgage bonds,

the petition likewise praying for the issuance of certain Receiver's certificates and the transfer of certain moneys to Kentucky.

On August 18, 1932, the Chase National Bank and John A. Burns, as Trustees, filed their petitions asking leave to file foreclosure bill under the First Mortgage, and, permission being given, on the same day their bill of foreclosure was filed. The pre-existing receivership was extended, and the receivership suit consolidated with the foreclosure suit. On September 13, 1932, a bill of complaint was also filed against the Larner Gas Company and others, the named corporation being a wholly owned subsidiary of the Hamilton Gas Company, seeking foreclosure of a mortgage in the amount of $300,000. This cause remained quiescent until after the reorganization of the Hamilton Gas Company, the notes secured by said mortgage having been acquired by the Hamilton receivers during the course of the litigation. Following the institution of these proceedings, the record discloses various parties in interest made unsuccessful efforts to agree upon a voluntary plan of financing the Hamilton Gas Company.

Under date of November 13, 1933, William A. Larner and A. F. Crichton, as Delaware Receivers, filed a petition in this Court exhibiting a proceeding in Delaware, whereby, by decree entered in August, 1932, William A. Larner, as Delaware Receiver, had been allowed the sum of $8,474.91 expenses and $9,000 as allowance as Receiver; $526.59 being allowed as expenses to his attorneys. Subsequently, this Court entered an order allowing Mr. Larner $5,000 upon his petition, and such sum was paid.

On December 16, 1933, the consolidated equity causes were referred to Beverley Broun, Special Master, and, after the incidence of the bankruptcy proceeding, hereinafter noted, the reference was extended to those proceedings. Proof was taken in February, 1934, showing the default of the First Mortgage and there were a large number of bonds and indebtedness proved before the Special Master, and also certain proof with respect of contracts of the defendant corporation.

On June 7, 1934, E. McLain Watters, Arthur Peck and Pierce Archer, Jr., as Debenture Holders Protective Committee, acting under an agreement of deposit with respect of such securities, dated January 28, 1932, and certain general creditors filed a petition for reorganization under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, the petition immediately following approval by the President of this statute. On the 8th day of June, 1932, similar proceedings had been instituted in New York, and thereafter the defendant company set up these proceedings as a bar to those in West Virginia. The issue presented was as to location of the principal place of business during the six months period prior to the filing of these petitions.

On June 21, 1934, this Court entered its order approving the petition filed in this jurisdiction, similar order having been entered on June 9, 1934, by the United States District Court for the Southern District of New York, approving the petition filed in that Court. Subsequently, after appeal to the Circuit Court of Appeals, 4 Cir., 75 F.2d 176, and extended litigation, the venue of the proceedings was determined to be in this District. See prior opinion in this case reported in, D.C., 10 F.Supp. 323, 324.

The jurisdictional litigation, however, occupied a considerable period of time, the Circuit Court of Appeals for the Second Circuit, In re Hamilton Gas. Co., 79 F.2d 97, reversing the District Court for the Southern District of New York, and the Circuit Court of Appeals for the Fourth Circuit finally sustaining the position of this Court, 79 F.2d 438. In both of these decisions, certiorari to the Supreme Court of the United States was sought and refused, Hamilton Gas: Co. v. Harper, 296 U.S. 647, 56 S.Ct. 307, 80 L.Ed. 460; Hamilton Gas Co. v. Watters, 296 U.S. 647, 56 S.Ct. 309, 80 L.Ed. 460.

On June 21, 1934, decree was entered holding that petition for reorganization had been filed in good faith setting forth a plan of reorganization on behalf of the petitioning creditors in the bankrupt cause. It is unnecessary to go into the details of this plan, as it was subject to subsequent modifications.

On August 16, 1934, Clarence L. Harper and his Committee associates and E. McLain Watters and his Committee associates filed petitions for the approval of the deposit agreements, under which they, respectively, acted as committee for the First Mortgage and the Debenture Holders, and on September 10, 1934, a decree was entered approving these petitions. On December 19, 1934, decree was entered, noting the appearance of counsel on behalf of Harry M. Blair, Robert Owston and Joseph

Walsh, as a Stockholders Committee. On January 5, 1935, there was filed the petition of Stewart Jamieson, John K. Blair, and Ambrose C. Hindman, recited as a Committee for Protecting Debenture Holders and other unsecured creditors, counsel being recited as Tompkins, Boal & Tompkins, Samuel T. Spears and Thomas J. Barrett.

In February, 1935, extensive evidence was taken here as to the jurisdictional question, and meanwhile the litigation in the New York jurisdiction was being vigorously prosecuted. Subsequently, appearances were made of petitions filed by Ronald M. Craigmyle and his Committee associates, as Committee for the First Mortgage Bondholders (that Committee acting, until the final agreement, in opposition to the so-called Harper Committee), and W. A. Nash, Elmer E. Powell, and S. P. Woodward, members of the so-called Independent Bondholders Committee.

Under date of October 31, 1935, the so-called Harper Committee and the Watters Committee, respectively, filed acceptances of the plan of June 21, 1934. The acceptance of the plan by the latter Committee lists total claims of general creditors represented of $2,194.50, and of depositing debentures from whom no dissent has been received of $518,500. It further reflects $6,000 of nondepositing debenture-holders from whom acceptances and approvals had been received, and depositing debenture-holders who failed to dissent within fifteen days, but who later forwarded dissents, of $65,000. Acceptances filed by the Harper Committee reflected deposited bonds as to which no dissents had been received of $1,292,000, and deposited bonds as to which dissents had been received of $251,000, and deposited bonds as to which, dissents were later received in the amount of $180,000.

On November 23, 1935, there was filed the petition of the so-called Craigmyle Committee, reciting that the plan then before the Court was unsatisfactory and suggesting an alternative plan. On December 3, 1935, an order was entered by Judge William E. Baker, sitting specially, lodging the petition of the Craigmyle Committee for further consideration, but that Committee was enjoined, pending hearing, from soliciting acceptances of its plan. During this period there was extensive circularization by the respective committees for and against the pending plan.

On December 12, 1935, the mandate of the Circuit Court of Appeals of the Fourth Circuit finally upheld the jurisdiction of the West Virginia court, and, thereafter, on March 19, 1936, a petition was filed by Austin Agnew, and others, as a Committee for Common Stockholders, setting up that such Committee had been authorized to represent slightly more than 48% of the common stock outstanding. Certain other individual petitions were filed at this time.

On June 19, 1936, this Court filed a memorandum opinion upon exceptions to the report of the Master, confirming that report, and holding that the Hamilton Gas Company was clearly insolvent. This Court also noted the difficulties between the various owners of the bonds, and refused to adopt the so-called Harper plan, allowing ninety days for amendment. Certain appeals were taken and dismissed.

On September 4, 1936, various individual interveners and the so-called Craigmyle Committee filed a petition for leave to intervene and for approval of the deposit agreement dated July 1, 1936. On December 17, 1936, a motion was made by the petitioning creditors and the so-called Harper Committee that its plan be confirmed, such being resisted by various interveners. The Court denied this motion, indicating that it could not approve or confirm the amended plan, and decree was entered permitting the prosecution of the foreclosure proceeding. This amended plan had been filed on September 4, 1936, jointly by the Harper and Watters Committees, and provided for the issuance of certain bonds and stock on reorganization, the stock to be in a voting trust of which the two committees (Harper and Watters) were to name the voting trustees.

On April 5, 1937, decree was entered, reciting an amended plan of reorganization sponsored by the petitioning creditors and the Harper Committee; whereupon the Agnew Stockholders Committee objected, attempting to reopen the question of solvency. It appears that more than two-thirds of the creditors had accepted this plan, and, in fact, it had been worked out chiefly through negotiations between the Harper and Craigmyle Committees, the plan making no provision, however, for the stockholders. It was objected to upon their behalf, and appeal was taken. The opinion thereon (Jamieson et al. v. Watters [Blair et al. v. Watters] 4 Cir., 91 F.2d 61) reversed the holding of this Court and

directed further proof on the question of insolvency.

On July 20, 1937, after the mandate of the Circuit Court of Appeals, the cause was submitted to a Master to determine the question of solvency. The latter reported on September 7, 1937, that the Company was insolvent. Thereafter, on September 22, 1937, this report was confirmed with certain immaterial modifications, the decree finding that the fair market value of the properties was $1,600,000, exclusive of cash in the hands of the Receivers, then amounting to $461,709.80, exclusive of a certain claim against the Inland Gas Corporation. The Court then approved certain amendments to the plan of reorganization proposed on September 21, 1937, and ordered that the final amended plan be submitted to the security holders.

The Court, by subsequent decrees, has transferred all of the properties of the Hamilton Gas Company to the reorganized company, except cash in the hands of the Receivers. Numerous petitions for allowances of the various parties in the litigation have been filed, and in 1938 a hearing was had, and subsequently briefs were filed by many applicants.

At the present time, there is approximately $376,894.92 in the hands of the Receivers awaiting the determination of the Court with respect of these allowances. A part of said funds is attributable to the Thompson Gas Company, a wholly owned subsidiary of the Hamilton Gas Company, for whom the Receivers have also been acting.

In the first instances, allowances were requested by the various applicants totalling $492,850.60, and expenses totalling $149,331.94, or a total of $642,182.54. To these original requests there have been added several additional claims. It is also noted that certain of the applicants, although claiming allowances, have not fixed the amount of such claims in terms of dollars, and, therefore, such claims are not included in the above monetary total. Likewise the record discloses a claim of the Irving Trust Company, as New York Receiver, but no oral evidence was introduced with respect of it at the hearing.

## Discussion.

As preliminary to consideration of these petitions for allowances, it is proper to determine whether or not the so-called Chandler Act amending the bankruptcy statute be applicable. Section 243, 11 U.S.C.A. § 643, 52 Statutes at Large, 900, liberalizes, and somewhat changes, the basis for allowances in proceedings of this character. It is strongly urged by several applicants for allowances that this amendatory act is applicable to these proceedings.

The Chandler Act was passed on June 22, 1938, effective on September 22, 1938. Prior to its enactment, petitions for allowance were filed, and verbal testimony with respect thereof was taken. By Section 276(c)(2) of the Act, 11 U.S.C.A. § 676(c)(2), it is provided, as to prior proceedings, that if a petition in such proceedings had been approved more than three months before the effective date of the amendatory act, the law should apply "to the extent that the judge shall deem their application practicable." Such discretion is, of course, a matter not to be arbitrarily exercised, and counsel rely in this connection on the decision in the matter of the Old Algiers, Inc., decided by the Circuit Court of Appeals of the Second Circuit on December 5, 1938, 100 F.2d, 374, a copy of which is appended to the brief filed by William M. Chadbourne and Price, Smith & Spilman, counsel for the Agnew Common Stockholders' Committee. In that case, the Court lays down, as one of the tests of practicability, the possession of funds still in the hands of Trustees, and it is true that in the present instance the Trustees (formerly the equity receivers) do have funds in their hands. In the Algiers case, however, it appears that the petition was approved on April 19, 1938, whereas here such petition in reorganization was approved in the year 1934. In that case, the time for proving claims of creditors had not expired. Here prior to the enactment of the Chandler Act, the final plan of reorganization had been approved. The petitions for allowances had been filed, a hearing had, evidence transcribed, and all of the major features of the case had been finally determined, virtually the only matter remaining being the determination by the Court of the amount of allowances, and which had at the time been taken under consideration by the Court. It would be presumed that both the parties and the Court would have the matter of the allowances as fixed by the law then in effect in mind at the time the plan was approved. It is not practicable, within the meaning of that act, to apply an amendment enacted long after this status

of the case had been reached. It may be added that the changes made as to standards of allowances by the Chandler Act would have very little, if any, effect upon any of the claims here made, except possibly a different basis would be established, to a limited degree, with respect of the claim of the Stockholders Committee.

It is not believed that an extended discussion of the principle applicable to allowances in proceedings of this kind is necessary. It is, of course, apparent that the aggregate allowances claimed are wholly disproportionate to the amount of property involved, the physical properties of the Hamilton Gas Company having been fixed at a value of $1,600,000, and the aggregate allowances claimed being greatly in excess of any funds in the hands of the Trustees. The amount of property involved in the proceeding, as well as the value of the interests of the litigation represented by the respective applicants, are important factors in determining allowances. Generally, the amount of allowances, while determined by the particular facts and circumstances present, and while largely in the discretion of the Judge, should be moderate and not liberal. Economy is an inherent policy in the administration of the Bankruptcy Law. In re Davison Chemical Company, D.C., 14 F.Supp. 821; West v. Fradenburg, 8 Cir., 86 F.2d 318; Silver v. Scullin Steel Co., 8 Cir., 98 F.2d 503; Callaghan v. R. F. C., 297 U.S. 464, 56 S. Ct. 519, 80 L.Ed. 804.

Perhaps the most important rule applicable to the situation here presented is that allowances may be made to those representing committees of creditors or stockholders for only such services as are of general benefit to the estate, and not for particularized services to such groups. In re National Lock Co., 7 Cir., 82 F.2d 600, Certiorari denied, National Lock Co. v. Rosengard, 299 U.S. 562, 57 S.Ct. 25, 81 L. Ed. 414; In re United Cigar Stores Co., D. C., 21 F.Supp. 869; Steere v. Baldwin Locomotive Works, 3 Cir., 98 F.2d 889; In re Nine North Church St., 2 Cir., 89 F.2d 13, Certiorari denied Glass & Lynch v. Nine North Church St., 302 U.S. 709, 58 S. Ct. 29, 82 L.Ed. 547; In re Middle West Utilities Co., D.C., 17 F.Supp. 359; In re Herz, 7 Cir., 81 F.2d 511.

In the present proceeding, counsel have, in many instances, performed extensive services for their clients, for which such clients should pay, but because of the particular character of the services, allowance from the estate as a whole would be improper. Disallowance for services of this character rendered to a particular group represented, carries with it no implication that such services were not proper or that they should not be compensated, but, because such services are for a particular group or interest, as distinguished from the estate as a whole, they cannot properly be paid from the general funds.

In order to justify allowances, services must not only directly benefit the estate as a whole, but must be constructive, both in character, and, in a measure, in result. Mere participation in hearings, offering advice, suggestions or criticism of themselves furnish no basis for allowance. In re Paramount Publix Corp., 2 Cir., 85 F. 2d 588, Certiorari denied, Palmer v. Paramount Publix Corp., 300 U.S. 655, 57 S.Ct. 432, 81 L.Ed. 865.

An estate must bear no duplication or multiplication of services. If compensable services be rendered, for example, by two attorneys or by two creditor committees, it is well established that such circumstance does not permit an increase of the aggregate allowance. Any such allowances are divided between the contributing participants and not increased in the aggregate. Straus v. Baker Co., 5 Cir., 87 F. 2d 401 (Modified, 5 Cir., 89 F.2d 322, but not in this particular); Steere v. Baldwin Locomotive Works, 3 Cir., 98 F.2d 889; In re Buildings Development Company, 7 Cir., 98 F.2d 844.

Services rendered prior to the institution of the corporate reorganization proceeding in this case, the receivership and foreclosure suits in equity, may be compensated as a part of the costs of reorganization, if of value in the formulation and adoption of the reorganization plan. In re Buildings Development Company, 7 Cir., 98 F.2d 844; Silver v. Scullin Steel Co., 8 Cir., 98 F.2d 503.

With these principles and other principles laid down by the courts in mind, a consideration will now be had of the respective claims.

### Claims with Respect of First Mortgage of Hamilton Gas Company.

The Chase National Bank, corporate Trustee, claims compensation in the amount of $7,500 and costs and expenses of

$130.21. Steptoe & Johnson, counsel for the Trustee, ask $20,000 compensation, there being no separate account for expenses. Milbank, Tweed, Hope & Webb, counsel for the Trustees, ask $40,000 as such counsel and $613.74 expenses. The individual trustee in the corporate mortgage makes no claim for allowance. Accordingly, the amount asked as to this First Mortgage aggregates $68,243.95.

The bond issue of the Hamilton Gas Company secured by First Mortgage, dated September 1, 1927 (there being a supplemental indenture dated December 1, 1927, of the Thompson Gas Company), consisted of the principal amount of $2,325,500 bonds outstanding. On August 18, 1932, there was filed in this Court by the Trustees of this Mortgage, The Chase National Bank and J. A. Burns, a bill of foreclosure, there being likewise proceedings filed in Kentucky. Proceedings in this cause were consolidated with prior equity causes, as elsewhere set forth. The mortgage provides that the trustee shall be entitled to reasonable compensation, and provides for the payment of counsel fees. It is stated in the petition of The Chase National Bank that the services of the individual Trustee were rendered in connection with his employment as corporate trustee, and he makes no separate application for allowance.

The petition of The Chase National Bank describes certain services rendered prior to the receivership in connection with the retirement of some bonds, the compiling of data for an employee of the Bank to give testimony as to the date, as to the execution and delivery of the mortgage, the issue of the bonds, the default, the change in the mortgaged premises resulting from releases, etc. Certain other matters are set up, all obviously of a legal character, such as examination of petition, applications, etc. The petition likewise sets up examination of plans of reorganization, etc. Many of the services testified to were furnishing data, making releases, etc., that are of an incidental character to the trustee in a corporate mortgage. It is to be remembered that much the greater number of bondholders under this mortgage were represented by various committees and the bank did not have the primary obligation of representing them, except within a limited scope. It appears that, exclusive of matters peculiar to the litigation as to which counsel for the bank would perform the greater part of the services, the bank had very little work except that generally performed by a trustee in a corporate mortgage for a small fee.

With respect of the claim for services of Milbank, Tweed, Hope & Webb, the principal work set forth was: (a) Investigation with respect of the proposed issue of $40,000 of prior lien Receiver's Certificates, of which $9,000 were ultimately authorized; (b) proceeding to impound for the benefit of the bondholders income earned from the mortgaged property; (c) preparation of foreclosure proceedings in West Virginia and Kentucky; (d) certain work with respect to application for allowances to the Delaware receivers; (e) certain questions of priority; (f) preparing for testimony in support of the allegations of the foreclosure bill; and (g) keeping in touch with the general proceedings. Other services are likewise recited. It appears, furthermore, that these counsel took five trips to Philadelphia for conferences with counsel for bondholders committees, two trips to West Virginia and one trip to Asheville, North Carolina. Mr. Gammell of this firm details at length in his testimony various legal questions considered. These questions impress me as being of comparatively simple character, generally incidental to any foreclosure proceeding, although demanding a lawyer accustomed to dealing with corporate problems and problems of mortgage foreclosure, as these attorneys undoubtedly were.

Steptoe & Johnson have filed a petition likewise as counsel for the Trustee, in association with Milbank, Tweed, Hope & Webb. It appears from the record that almost all of the actual court appearances made on behalf of the mortgage trustee were by Steptoe & Johnson. A considerable part of the services of this firm, as will appear later, was in representing certain committees of creditors and performing certain special services. It is a difficult matter to segregate the services performed by them that are attributable solely to the mortgage trustee, as there is necessarily a certain amount of overlapping. They filed the original bill of foreclosure in both this court and that of Kentucky; they appeared in hearings before the Special Master, both in West Virginia and Kentucky; appeared in resistance to the claim of the Delaware receivers to the intangibles of the Hamilton Gas Company; studied and considered various intervening

claims for well rentals of certain Kentucky lessors; appeared in oral argument and filed briefs before the District Court of Kentucky and the Circuit Court of Appeals. They estimate a total time spent of 874¼ hours, as set out on page 5 of their petition, and a detailed itemization of three members of the firm showing an aggregate of 799¼ hours. This firm requests $20,-000, no special expenses being sought, and by supplemental petition for services since December 1, 1937, performed by Messrs. Stanley C. Morris, William E. Miller and Robert W. Lawson, Jr. The supplemental petition indicates 19¾ hours by Mr. Morris and 26¾ hours by Miller and Lawson, and no expenses. A consideration of the record leads to the conclusion that the greater part of the services of these two firms was performed by Steptoe & Johnson.

■ In determining allowances with respect of these three petitions, it must be borne in mind that the foreclosure suit, during a large part of the litigation lay dormant, or involved only formal matters. The various bondholders, as heretofore stated, were represented by various committees. In view of the general nature of the foreclosure suit, additional representation of the bondholders secured by the mortgage, the size of the mortgage, and other factors present, allowances in the aggregate to the First Mortgage Trustee and its attorneys should not exceed $12,743.95, and that sum should be divided as follows:

The Chase National Bank $2,000.

Milbank, Tweed, Hope & Webb $4,000.

Steptoe & Johnson $6,000.

The expenses of The Chase National Bank, as claimed in the petition, of $130.21 appear to be proper and are allowed.

Expenses claimed by Milbank, Tweed, Hope & Webb in the amount of $613.74 likewise appear to be proper and are allowed.

### The First Mortgage Bondholders' Protective Committees and Their Counsel.

■ In this division of the proceeding, aggregate requests for allowances and expenses were made in the total amount of $304,865.61. There have been certain additions to these original claims. It is to be noted generally in considering these claims that the value of the physical property of the Hamilton Gas Company, exclusive of cash in the hands of the Trustees, was fix-

ed by the Special Master in his report of September 22, 1937, at $1,600,000, and such report has been confirmed. The claims, therefore, of those representing the First Mortgage bondholders, in the aggregate, are entirely disproportionate to the value of the property.

### The "Harper Committee" and Its Counsel.

The following claims are made with respect of the "Harper Committee", representing a number of the First Mortgage bondholders:

| | |
|---|---:|
| Committee claim for allowance | $35,000.00 |
| Expenses originally claimed | 95,405.98 |
| Supplemental claim for expenses | 956.32 |
| White & Clapp, counsel for Harper Committee claim for allowance | 61,500.00 |
| Expenses | 193.86 |
| Steptoe & Johnson, counsel for Harper Committee (also as counsel for petitioning creditors) claim for allowance | 45,000.00 |
| Expenses | 1,476.71 |
| First Supplemental petition for "further compensation": | |
| Expenses | 172.47 |
| Second Supplemental Petition for "further compensation": | |
| Expenses | 480.92 |

■ It appears that this Committee was organized in January, 1932, at the very inception of the original receivership litigation, being composed of five members. Mr. Clarence L. Harper was Chairman. He was a member of the firm of Harper & Turner, investment brokers, who owned a considerable amount of the First Mortgage bonds, with customers owning "upwards" of $500,000 of this issue. Mr. Samuel McCreary, a member of the Committee, was likewise an investment dealer and broker, and customers of his firm were owners of a considerable amount of the bonds. While such ownership of securities prior to the initiation of the proceedings (the rule may be different for those acquired thereafter) is not a disqualification, nevertheless in such case, personal interest of committeemen, with the natural impulse to protect such securities, is one of the factors recognized in limitation of allowances in such cases. In re Consolidation Coal Co., D.C., 14 F.Supp. 845.

This Committee undoubtedly performed a great amount of work. The petition alleges a voluminous correspondence, many conferences, etc. On June 21, 1934, a plan of reorganization was submitted by the Reorganization Committee, of which Mr. Harper was Chairman, four of said Com-

mittee being members of the Harper Committee, and three being members of the Watters Committee. Opposition developed to this plan, the "Craigmyle Committee" leading that opposition. This first plan provided for a voting trust to extend ten years, the voting trustees to be named by the Harper-Watters Reorganization Committee, the final plan providing that the stock of the new company should be in a voting trust for a period of five years, with the privilege in the majority of outstanding certificate holders to terminate it at the end of two years, the Trustees to be appointed one from the Harper Committee, one from the Craigmyle Committee and the third to be appointed by the Court. This issue of control through the voting trust was what possibly caused the greatest dissension among the First Mortgage bondholders. Considerable activity, apparent in the record, is attributable to this issue, as to the voting control. Both the Harper Committee and the Craigmyle Committee circularized bondholders. The Craigmyle Committee did not seek the deposit of securities with it, but did seek most actively dissents from the Harper plan. The Harper Committee took the position that no depositing bondholder would be permitted to withdraw his bonds without paying a proportionate contribution toward the expenses of the Committee. It is testified to by Mr. Larner, and, in fact, by Mr. Craigmyle and Mr. Marshall, counsel for the Craigmyle Committee, that the opposition to the original plan of the Harper and Watters Reorganization Committee bore largely upon the matter of control through the voting trustees.

Another change from the original Harper-Watters plan was the reduction of interest rate.

The original plan provided that all indebtedness secured by collateral should be paid in full in the reorganization. The final plan provided that as to such debts the collateral should be appraised, and the claims paid in full only to the extent of the value of the collateral. Mr. Harper had a personal interest in this clause, as his firm held a debt in the principal sum of $25,000, secured by $35,000 par value, the actual value of the bonds at the time being less than the debt; but the record shows that he willingly acquiesced in this change when it was called to his attention. There were certain other minor changes in the plan, but the foregoing represent the major departures in the final plan of reorganiza-

tion from that originally submitted on June 21, 1934, except that the latter provided for a limited participation by the stockholders in the reorganized corporation, such participation being eliminated because of the finding by the court of insolvency.

It appears from the record that a considerable part of the services of the Harper Committee was brought about by conflicting opinions among the bondholders chiefly represented by the Craigmyle Committee. Little actual discussion of the plan ensued, so far as the record discloses, until the matter of jurisdiction, hereinafter discussed, was determined. Then followed a period of active circularization, opposition and disputes among the bondholders and the Committees ending as above noted. At all times the Harper Committee and its counsel were actively urging the consummation of the plan, and, in the course of the litigation, it has been said that opposition to this plan was brought about through activities of committees that were, in a sense, volunteer committees. However, regardless of the source or motives of this opposition, it resulted in modifications included in the plan that was finally adopted. In this phase of the matter, while the Harper Committee was undoubtedly furthering a plan, a large part of which was accepted finally, nevertheless, a considerable part of its services, perhaps the greater part, was rendered in the course of maintaining its position as between the disputant bondholders, rather than in furtherance of the general benefit of the estate. Such position as the Harper Committee took may have been entirely correct and for the benefit of the group of bondholders which it represented, but those are group services and are not services to the estate as a whole.

Another major activity of the Harper Committee was with respect to the jurisdictional litigation, involving the question of whether or not venue was in New York or in West Virginia. Such question, of course, was primarily a legal one, and its consideration will be deferred until the consideration of attorneys' fees.

Any allowance, therefore, to the Harper Committee must:

(a) Differentiate between services rendered for the benefit of the estate; and,

(b) Services to the group of bondholders represented; and,

(c) It should be determined to what extent the aggregate amount allowable for

services to the estate on behalf of the First Mortgage bondholders should be allowed to other committees.

Under the authorities heretofore cited, it is the duty of the Court in proceedings of this character to determine a reasonable fee for the services rendered in furtherance of the reorganization plan and for the benefit of the estate by any representatives of security holders, where such representatives are entitled to allowance, and such aggregate should be apportioned among those contributing those services.

■ It will appear from the discussion elsewhere set out that the Craigmyle Committee, while not performing services to the extent of the Harper Committee, nevertheless, did contribute to the final plan, and, accordingly, the allowance to the Harper Committee must be proportionately reduced from what it would have been, had that Committee been sole author and sponsor of the plan. Mr. Harper, representing his Committee, very frankly testified:

"Q. Was that not the major issue between you and the Craigmyle Committee, the question of control as between you? A. No, because we felt, as original nursemaids of this proposition, and having a majority of the bonds, we were entitled to at least, you might not say control, but a dominant interest.

"Q. Your assertion of that dominant control and the Craigmyle opposition to it furnished the major part of the delay and dispute during the last year and a half? A. The major dispute, you mean?

"Q. Yes? A. Yes.

"Q. The residue of the dispute was chiefly between you and the stockholders of the Debtor as to the question of insolvency? A. I think the record will show that is just it." (R. p. 144.)

■ It may be that the group of bondholders represented by Mr. Harper's Committee desired this dominant control and that such may have been beneficial to such group, but, certainly, under the limitations with respect of which allowance may be made, compensation for the furtherance of such group interest cannot be allowed by this Court.

■ It is difficult to separate those services of the Harper Committee which were directly for the benefit of the estate from those which were with respect to collateral matters. The latter, such as the further-

ance of the desire for control, etc., may be proper subjects for compensation by the bondholders concerned. As to this the Court is not called upon to pass, but certainly they are not proper subjects for compensation from the estate as a whole. Under all the circumstances, and bearing in mind these factors, an allowance to the Harper Committee for compensation is made in the sum of $16,000.

Expenses of the "Harper Committee."

■ Examining the expenses of the Harper Committee, the first item requested is one for printing and advertising of $2,119.-85. It is impossible for the Court, in the absence of a breakdown of these expenses, to determine what part is beneficial to the estate as a whole and what part is attributable to the group activities of this Committee. In the absence of a breakdown of this character, the Court might be justified in disallowing all of these expenses. See In re Middle West Utilities Co., D.C., 17 F.Supp. 359. But as some of these printing expenses were doubtless attributable generally to the estate, the Court will allow forty percent thereof, or $847.94.

The same situation is presented with respect of the item of traveling expenses in the amount of $2,494.26, of which forty per cent, or $997.70, is allowed.

■ The third item of expense is depository charges in the amount of $2,307.07. This is not itemized, but doubtless related to the deposit of securities, and is allowed.

■ This Committee also presents a claim of $14,580.47, engineering services. Mr. Harper testifies on page 135 of the record that there were four reports—a report of Day & Zimmerman, a supplemental report by them, and the La Peire reports, made, respectively, in December, 1935, and July, 1937. The first of these reports was obtained by the Committee for negotiations with the Manufacturers Trust Company, looking to a private loan to refinance the Company. In this report there was what Mr. White, of counsel for the Committee, testified to as "a very provisional valuation" of $4,000,000, being primarily made for the Manufacturers Trust Company. The first La Peire report showed a valuation of approximately one-half, and the second report showed a further reduction (see transcript of testimony offered at the hearings on applications for allowances, page 135). On page 137 of the transcript, Mr. Harper testified:

"Q. The La Peire report was for the purpose of ascertaining what the purchaser would pay at a foreclosure? A. Yes.

"Q. But not on this plan? A. No.

"Q. The Day & Zimmerman report had no relation to that but was to show that the Manufacturers Trust Company could loan $600,000 on it? A. It had no relation to the loan.

"Q. It had no relation to the court plan? A. It was an adjustment.

"Q. For financing by the Manufacturers Trust Company? A. Yes.

"Q. The La Peire report had to do with finding out what a buyer would pay on foreclosure? A. Yes.

"Q. You were dealing with a cash purchaser at a foreclosure in the La Peire report? A. Yes, we tried to establish the company's value as to whether or not it was insolvent."

It is, therefore, apparent that these engineering reports were for purposes other than the furtherance of the plan of reorganization, but they were used and were of some value in connection with the consummation of the plan. The La Peire report was used and was of value in the determination of the question of insolvency. Mr. White testifies (on page 135) that approximately $5,000 was paid for the La Peire report. These reports were made without prior knowledge or authorization of the Court, but, as they were used and undoubtedly in some phases of the litigation were beneficial to the estate as a whole, forty per cent or the amount of $5,832.19 of this item will be allowed.

█ The next item of expense of the Harper Committee is one of interest on bank loans, amounting to $13,711.83. This has been increased by some additional expense, making a total of somewhat more than $14,000. With respect of this item, Mr. Harper testifies on page 133 of the transcript:

"A. It is very necessary to provide for the expenses of this proposition and from time to time we borrowed money from the Philadelphia National Bank upon the security of the deposit of bonds, which we were permitted to do by the Deposit Agreement. It is the interest running over a period of six years.

"Q. In other words, you borrowed money from the Philadelphia National Bank to pay these various items of expense and paid interest on the current notes? A. Yes, sir.

"Q. And the interest charge is really a mounting charge over and above the other charges by reason of the use of the money. Did you call on any bondholders for contributions at the time of deposit or otherwise? A. We did not.

"Q. You are asking that the court repay that interest as part of the administrative costs? A. We are."

Counsel for the Trustees take the position in their brief that allowance of this interest on bank loans will involve a fundamental favoritism to those bondholders represented by the Harper Committee and that, if contributions for expenses from the bondholders interested had been solicited and received, it would be apparent that such bondholders could not claim interest for the contributions they made to the expense of enforcing their own bonds. Counsel further call attention to the fact that the Craigmyle Committee and other committees (except the Watters Committee) are making no claim for interest on money expended. It seems to me that there is no part of this case where the line of demarcation between estate expenses and groups expenses more clearly appears. The protective agreement dated February 1, 1932, in paragraph 3(l) thereof specifically gave the Committee the right to borrow money. Such borrowing provision saved the bondholders from making advances for expenses of the committee, as otherwise would have been necessary. Nevertheless, however beneficial this course of the committee may have been to the particular group of bondholders represented, certainly it would be manifestly unfair to require other bondholders to contribute to these carrying charges of the Harper group, and yet such would be the result if an allowance for interest were made. The same considerations apply to the other item of expense of $189 taxes on deposited bonds. So far as the record shows, these appear to be entirely proper charges against deposited bonds, but they are not the proper subject of general allowance from the estate.

█ The largest item of expense claimed by the Harper Committee is a fee of $17,500 to Cook, Nathan, Lehman & Greenman, Attorneys, and out-of-pocket expenses paid to these attorneys of $3,153.07. It is stated in the petition that the services of this firm

were secured for the purpose of "defending the jurisdiction of the United States District Court for the Southern District of West Virginia," against the attempt of the Debtor to establish jurisdiction in the New York Court. The jurisdictional litigation was involved and the record voluminous. It was prosecuted both in New York and in West Virginia, but, of course, Cook, Nathan, Lehman & Greenman took part only in the New York litigation. On July 22, 1935, the Circuit Court of Appeals for the Second Circuit, reversing the lower court, held that West Virginia, and not New York, was the principal place of business during the period in question. On October 8, 1935, the Circuit Court of Appeals for the Fourth Circuit reached the same conclusion. On December 9, 1935, the Supreme Court of the United States denied application for certiorari from the foregoing decisions. However desirable from the viewpoint of the Harper Committee and perhaps of its bondholders it may have been to maintain jurisdiction in West Virginia and however proper this item of expense may be as a charge against depositing bondholders, as to which, of course, the Court does not pass, it seems clear that in order for such a payment to be a proper subject for allowance from the estate as a whole, the incurring of such expense should have been previously submitted to this court.

Differing opinions, understandings, beliefs and policies may have been and doubtless were present in the minds of the various security holders. In such case, if it were permitted for one group of security holders, acting through one Committee, privately to intervene without court authorization and prosecute jurisdictional litigation of this kind, it would seem to follow that the same right would adhere in other groups. It seems to me that before such litigation should be undertaken and large expenses incurred that the matter should have been submitted to this Court for its prior authorization and determination. In such case if the Court had determined upon the prosecution of the litigation, it doubtless would have been through the Trustees appointed by this Court. As it is, the Court is asked to provide for large expenses incurred in the prosecution of the litigation in New York by attorneys not under the jurisdiction or control of this Court, and whose fees are only before the Court as an item of expense filed by a committee of bondholders about three years after the services were performed. If the litigation had been authorized and prosecuted under the authority of the Court, the fees would have been subject to the Court's scrutiny and the provisions of the Bankruptcy Law, all of which is avoided by the course taken of prosecuting this litigation through a committee. There is not attributed to the Committee any improper intention of avoiding the ordinary procedure, but it would seem to me contrary to public policy and the intention of the law that allowance could be made under such circumstances. See In re Middle West Utilities Co., D.C., 17 F.Supp. 359; In re Celotex Co., D.C., 13 F.Supp. 1011, 1018; In re Mercantile Arcade Realty Corp., D. C., 20 F.Supp. 397. These items of fee and expenses claimed must be disallowed.

The next item of expense claimed by the Harper Committee is the payment to Goodwin, Smith & Ely, Attorneys of Washington, D. C., of $1,800 for services, and out-of-pocket expenses of $25.97, such expenses being recited as for services rendered in connection with obtaining an amendment to the bill then pending in Congress, afterwards known as Section 77B of the Bankruptcy Act. This is frankly a payment to attorneys for influencing legislation in Congress. An allowance under such circumstances is obviously improper. In re Chicago Rapid Transit Co., 7 Cir., 93 F.2d 832.

There is an item in the expense account of the Committee of Marvel, Morford, Ward & Logan, Attorneys of Wilmington, Delaware, recited as for "advisory service" in the sum of $50 and $3.76 expenses. The exact character of these services is not apparent. However, the items are small, and, as the debtor was incorporated under the laws of the State of Delaware, it is quite possible that they were for advice in the line of the general duties of the Committee, and the $53.76 will be allowed.

There is an item of $750 paid to Price, Smith & Spilman for legal services rendered in the ancillary receivership suit of Harper and Turner against Hamilton Gas Company, in this District and in the United States District Court for the Eastern District of Kentucky. These services were rendered in the receivership proceedings antedating the petition in bankruptcy for reorganization. Under some circum-

stances, matters arising from such prior receivership proceedings are proper if they contributed generally to the benefit of the estate. The prior receivership proceeding was instituted for the purpose of protecting the property, and the debtor corporation doubtless received benefits, as property protection was concerned. However, the Court is confronted with the rule laid down In re Middle West Utilities Co., D.C., 17 F.Supp. 359, 375, and In re Celotex Co., D. C., 13 F.Supp. 1011, 1018, and this item must be disallowed.

■ There are two items, respectively, as to White & Clapp for services and expenses in the amount of $5,844.49, and to Steptoe & Johnson in the amount of $11,496.74. The record discloses that both of these attorneys have rendered services properly attributable to the activities of this Committee, for which allowance should be made in sums greater than these. Technically, these items should properly be allowed directly to the attorneys, but, to avoid circumlocution, they will be allowed as an item of expense of this Committee, and as such will be taken into consideration as hereinafter set out in making allowances to the attorneys.

■ Included in the expenses of the Harper Committee is an item of $2,625, compensation for "specific services" of William A. Larner, also an item of "sundries" of $836.97 and $11,416.67 advances made to him directly or disbursed for his benefit. It is not clear just what the "sundries" are ·—presumably, from their position in the account they are attributable to Mr. Larner. As to at least a part of these services, Mr. Larner apparently assigned, or attempted to assign, his compensation as Delaware Receiver, but it appears that the previous allowance made to him as such Receiver was not so applied. This employment of Mr. Larner was in the early stages of the litigation prior to the bankruptcy proceedings. Mr. Harper testified that for a year up until September, 1933, "we thought Mr. Larner's assistance very important in the reorganization of the company." Mr. Harper further states that he does not "think" the Committee ever employed Mr. Larner for the purpose of soliciting depositors, but that the Committee was paying him something "in order that he might live and bring us continued and definite reports of the progress of the company and whether the leases were to be continued, disposed of, etc.." Mr. Harper

likewise testifies that his services were attributable to efforts to induce the Manufacturers Trust Company to assist in refinancing the company. Mr. Larner testifies that the item of "$2,250.00" (probably intended for the item of $2,625) "was a payment for salary, and the residue of the account was a loan." The character of Mr. Larner's activities is considered later with respect of his application for allowance. Evidently the payments to him were either for so-called salary or as a loan during the period in which he was receiver of the Delaware Court. His activities, in their very nature, were either as such receiver, as president of the debtor, or because of his personal interest in the debtor corporation. If a Protective Committee of Bondholders employed a Receiver of the Court, certainly their payments to him would not be a proper subject of allowance. The Court itself would make any proper allowance to him in his capacity as such Receiver, and allowance has been made in the sum of $5,000 to Mr. Larner as Delaware Receiver, and, whether such be regarded as upon his expenses or for compensation, it represents what the Court considered a proper allowance at that time.

It is obvious that it would be highly improper for a court to make allowance to a protective committee for a payment which that committee made to a receiver appointed by the court of another jurisdiction. As to that part of the Committee's expenses designated by Mr. Larner as a loan, the same reasons obtain with even greater force. Certainly no proper allowance could be predicated upon a loan by a protective committee to the receiver of a court in faith of future allowances that might be made to him as receiver. Any activities that Mr. Larner performed in his capacity as president of the debtor would, of course, not be subject to what would amount to an allowance to him through channel of the protective committee, and the same would be true as to any activities because of his personal interest. Mr. Larner has testified at length as to the services he gave with respect to property in assistance to the West Virginia receivers, in matters of contract, etc. Without going into the question of such services at this time, if they were of general benefit to the estate, they would be within the purview of any allowances that would be made to him as Receiver, and it would not be within the proper function of any Commit-

tee of security holders to pay them and look to the Court for reimbursement. If these services were peculiarly for the benefit of the Committee, then, of course, they would fall within the classification of group services and not services for the general benefit of the estate. It seems to me that under no possible conception of the character of the services of Mr. Larner could reimbursement to the Committee be allowed for amounts paid to him. Mr. Larner has characterized "the major" portion of his services as a loan, and the Committee must look to him for the repayment of the loan.

There is included in the expenses of the Harper Committee, certain obligations, for which no disbursements up to the time of the filing of the petition had been made, of $1,500 to the secretary of the Committee and $3,000 for secretarial and clerical services rendered by the employees of the Chairman. Doubtless the secretarial services were necessary. Undoubtedly a portion of such services were for activities of the Committee as to which allowance could properly be made, and undoubtedly a portion would be for so-called Committee services as distinguished from services for the general benefit of the estate. While unable accurately to draw a line of discrimination, the Court will, in this instance, follow the policy above with reference to traveling and printing items, and will allow forty per cent, or $1,800, of this item for secretarial services.

Relative to the item of $3,000, this is in the nature of an "over-head" expense, as to which there is discussion elsewhere, and has been taken into consideration in fixing allowance of compensation to the Committee, but should not be specially allowed as a separate item. The interest item in the supplemental petition is not allowed for reasons hereinbefore given, but the other items totaling $103.82 are allowed. The expenses allowed the Harper Committee aggregate $29,283.72.

#### Petition of White & Clapp, Counsel for the "Harper Committee."

There is claimed by these attorneys $61,500 compensation in addition to the sum of $5,000 previously received from their clients and $193.86 expenses.

This firm, in association with Steptoe & Johnson, was counsel for the "Harper Committee" throughout the litigation. The original petition recites that the actual record of time spent in connection with the case by this firm totalled 4,041 hours, of which 2,646 hours were spent by the senior member of the firm, that petitioners also have written or received and considered 2,216 letters, of which 145 of the letters transmitted by petitioners were formal opinions, and in addition 20 circular letters to bondholders. The senior member participated in 343 conferences in his own offices, exclusive of numerous conferences in other cities and innumerable telephone calls. It may be stated in passing that records of time devoted to the matter in hand by attorneys, while indicative of their activity, are of little value in gauging allowances in proceedings of this character, although a factor to be considered. In re United Railways & Electric Co., D.C., 15 F.Supp. 195; In re 211 East Delaware Place Bldg. Corp., D.C., 13 F.Supp. 473; In re Middle West Utilities Co., D.C., 17 F. Supp. 359.

It may also be noted that correspondence, conferences and the like are increased by the fact that other attorneys are interested in the litigation, and, of course, duplication of attorneys is not a ground for increase of allowance. Straus v. Baker Co., 5 Cir., 87 F.2d 401.

It is very clear, however, that these attorneys have been actively engaged during the several years during which this litigation has been pending. Mr. T. R. White, senior member of this firm, in his testimony calls attention to the fact that the claim is as counsel, not only for the bondholders, but also for the Reorganization Committee under the plan of reorganization of June 21, 1934, and as later changed. He first had the duty to prepare the protective agreement of February 1, 1932. He makes reference to negotiations with the Manufacturers Trust Company which, in October, 1933, declined to advance funds. These and similar negotiations, which formed so great a part of the earlier activities of Mr. Larner, were private attempts to refinance antedating the bankruptcy proceedings. At that time, the receivership might be designated as somewhat of a "caretaking" receivership. Such efforts were unsuccessful, and it seems to me those services would not be a proper subject of allowance here—

(a) Because they were not sufficiently connected with the administration of the

receivership estate,' and, of course, with the bankrupt estate, and

(b) However commendable their purpose may have been from the viewpoint of the debtor corporation and its security holders, they did not contribute anything of benefit to the reorganization, unsuccessful as they were.

Mr. White next testifies that in view of the failure of the plan of refinancing in the fall of 1933, it became necessary to go forward with the plan of reorganization originally scheduled; that litigation resulted also in opposition from the former president of the company who was dissatisfied with the plan, and that in the spring of 1934 it became apparent that Section 77B would be passed. He then details activities looking to the amendment of the bill in Congress. For reasons set out in disallowing the expenses of the Harper Committee for attorneys in Washington, these services are not the proper subject of allowance. Mr. White then refers to the plan of reorganization, dated June 21, 1934. This was the original plan and was, as it were, the point of departure for the various steps in reorganization. This service and those with relation to the filing of the petition in bankruptcy are proper subjects for allowance.

Mr. White then testifies of the litigation ensuing relating to the so-called conflict of jurisdiction between New York and West Virginia, stating that the burden was principally borne here by Steptoe & Johnson. For reasons given in denial of the claim of the Harper Committee for reimbursement of fees paid to New York attorneys, no allowance can be made to this firm for these services.

Mr. White also speaks of services in connection with the Securities Act, and the approval of the bondholders protective agreement by the Court. A protective committee is a proper function in reorganization proceedings of this character, and I believe proper allowance should be made for services of this character.

Mr. White also speaks of the question as to whether deposited bonds could be withdrawn from the committee without payment of expenses. It appears in many places in the record that the Harper Committee and its counsel were occupied in considering the question of whether bondholders could withdraw bonds from that Committee without making such payments.

It is obvious that the committee, with the broad powers conferred upon it by this protective agreement, would have a definite interest in protecting itself against expenses. Without considering the question as to whether or not the position taken by the Harper Committee was correct or incorrect, or whether the amounts fixed from time to time by it as conditions precedent to any bondholder withdrawing, were reasonable or unreasonable, certainly any services performed by counsel in this particular would be related to the issue between the committee and its depositing bondholders. They do not relate to matters beneficial to the estate as a whole. The protective agreement was approved by the Court, but it is the duty of a Court, as I conceive it, to approve any agreement satisfactory to the parties which the Court regards as fair and meets the requirements of the statute. Such approval, when given, would certainly carry with it no obligation upon the court either to interpret or to enforce the terms of such agreement at the expense of the estate as a whole. Certainly such approval would not form a basis for allowance for services arising over disputes largely turning upon the reasonableness of monetary burdens imposed upon the dissenting bondholders by the Committee. It seems to me that services of this character, however proper and valuable they may have been to the Committee, do not bear such relationship to the estate as a whole as permits allowance with respect to them.

On April 1, 1937, this Court approved the second plan. Appeals were taken by stockholders, and the case was remanded for further proof as to whether the stockholders were entitled to participate. White & Clapp cooperated with Steptoe & Johnson in this litigation, and this activity, having relation to the plan ultimately adopted, is a proper subject of allowance, but it appears from the record that by far the major portion of the work in this particular was done by Steptoe & Johnson. Mr. White very frankly and generously states that Steptoe & Johnson bore the brunt of the hearing in this Court; that whatever the Court "may allow us, I think the Court should allow Steptoe and Johnson more, because they have done very fine work in this case". He also speaks, however, of his firm being charged with the responsibility, from the beginning, of the supervision, direction and control of the legal proceedings involved in the reorganization, both here and in New York.

▮ It is apparent that the situation here presented is that of two attorneys closely cooperating, the one bearing the brunt of the court work and the other closely in touch with the client. It is further apparent because of this general division of the work that White & Clapp performed, even to a greater degree than Steptoe & Johnson, a great amount of work that had relation to disputes between the bondholders and the Committee, to disputes between various committees, particularly with the Craigmyle Committee chiefly upon the issue of control of the reorganization corporation; work that for the most part is, in my opinion, not the proper subject of allowance. I am forced to the conclusion that however extensive and able the services of this firm have been to the Committee, much the greater portion of it relates to services which are not properly the subject of allowance by this Court from the estate as a whole. For their payment, attorneys should look to the client. It is further the duty of the Court to determine what a proper fee in the aggregate would be for allowable services rendered to this Committee, and then apportion such aggregate fee as equitably as may be to the respective attorneys rendering the same. In view of these considerations, it is concluded that the proper fee to these attorneys is the sum of $27,000. Of this sum they have heretofore received from the Committee $5,000, making a proper net additional allowance to them of $22,000.

The additional expenses claimed of $193.86 will be allowed, $844.49 of expenses having heretofore been paid.

The Claim of Steptoe & Johnson, as Counsel for Petitioning Creditors and the "Harper Committee."

▮ The original petition filed asks for compensation in the amount of $45,000 for services to the date of filing the petition and additional expenses of $1,476.71. With the original petition filed, there is a detailed statement showing an aggregate of approximately 3,904 hours of time spent. A petition supplemental to the original petition covering their services and out-of-pocket expenses since December 1, 1937, to February 21, 1938, requests "further compensation" for their services since said date and $172.47 expenses, the petition showing 121 hours additional time by Messrs. Morris, Miller & Lawson. A second supplemental petition for services since February 21, 1938, requests "further compensation" and $480.92 out-of-pocket expenses since February 21, 1938. This firm has been, perhaps, the most active participant in the litigation among the many lawyers involved.

It appears from the record, and for reasons set out in the discussion of the claim of this firm, that the greater portion of their work comes within the rules laid down as to proper subject matter for allowance, although a considerable portion of such work was in relation to matters as discussed under the claim of White & Clapp which are not proper subject of allowance, and as to which they must look to their clients for compensation. It appears from the record, and is supported by the testimony, that they rendered in these particulars, as well as in much extra court work, extensive services covering a period of several years of a nature properly subject to allowance. In my opinion, for these services, including services claimed in the two supplemental petitions, a proper fee to them would be $37,500, of which sum they have already received $5,000 from the Committee, leaving a net further allowance of $32,500, this including also service as attorneys for petitioning creditors.

The expenses of $1,476.71 filed with the original petition and $172.47 and $480.92 claimed by supplementary petitions are allowed, the total of the three items being $2,130.10.

### Craigmyle Committee.

▮ Ronald M. Craigmyle, David Van Alstyne, Jr., and Frank P. Benjamin, a committee representing First Mortgage bondholders, generally referred to as the Craigmyle Committee, have filed a petition requesting allowance in the amount of $20,000 for compensation and expenses in the amount of $4,132.49. This Committee was organized pursuant to the provisions of an agreement entered into August 20, 1935. There is dispute in the record as to the circumstances and necessity of the organization of the Committee. It is urged on its behalf that the Harper Committee, acting under the bondholders agreement of February 1, 1932, in seeking confirmation of the original plan, was acting contrary to the wishes of a considerable number of its depositors in that the Harper Committee would not recognize dissents of its depositors nor permit withdrawals unless the latter paid into the

Committee a substantial amount on account of the expenses of the Committee, as a condition precedent to withdrawal. On the other hand, it has been urged that the dissents in question were procured through the efforts of the Craigmyle Committee in circularizing depositors of bonds with the Harper Committee, and that the Craigmyle Committee unnecessarily injected itself into the situation.

It is stated in the petition of the Craigmyle Committee that the interest of the petitioning members grew out of the fact that the organizations with which they were connected were interested in a substantial percentage of the outstanding bonds, Mr. Benjamin being President of a trust company at Scranton holding in its own right or as Trustee $104,000 principal amount of First Mortgage bonds, Mr. Craigmyle being a member of a New York brokerage firm whose clients had bought bonds of the debtor corporation at the time of the original issue and, at the time the first Harper plan was pending, clients of his firm held over $300,000 principal amount of such bonds; Mr. Van Alstyne being a member of a brokerage firm of Philadelphia, whose clients, at the time of the first Harper plan, held over $180,000 principal amount of such bonds.

Mr. Craigmyle in his testimony denies having any bonds at the time of the Receivership, but states that his customers had a large number thereof, and for that reason he kept in touch with the litigation, and had some telephone conferences with Mr. Harper and one visit during the period from 1932 to 1934 (R. 227). He further testifies that it was upon the making public of the plan of June 21, 1934, the so-called original Harper plan, that the two principal defects became apparent—that too many securities had been issued for the value of the property and that the voting trust for ten years placed sole control of the affairs of the company in the members of the Harper Committee—these being in addition to the defect that secured creditors were paid at par regardless of the amount of their collateral. It appears that this latter defect was quickly recognized by Mr. Harper, as heretofore noted, and apparently there was little issue with respect to that.

Following the formal organization of the Craigmyle Committee in the summer of 1935, there was much circularization, by it of bondholders for dissents from the Harper plan. It is stated in the testimony of Mr. Craigmyle that approximately 120 holders of certificates filed dissents through his committee representing $840,000 par value of the bonds on deposit with the Harper Committee and $106,000 of undeposited bonds.

There is an issue as to these dissents and an issue as to the representation by the Craigmyle Committee, the Harper Committee at all times taking the position as heretofore noted that it had the right to represent all bonds deposited with it, except those bonds withdrawn by payment of a proportionate amount of the expenses of the Committee, but the Harper Committee did report to the Court various dissents it had received.

At the hearing upon the amended plan of the Harper Committee, about December, 1936, according to Mr. Craigmyle's testimony his Committee presented dissents of $946,000, of which $840,000 were from those whose bonds had been deposited with the Harper Committee (Transcript, p. 234). At that hearing, this Court refused to confirm the plan, appeal having been taken on the question of the right of stockholders to participate in the reorganization and the Circuit Court of Appeals having remanded the case for further proof. This Committee appeared before the Special Master to whom the matter had been submitted for the taking of evidence, and produced engineers' report as to the value of the property, and, after the coming in of the Master's report showing the value of the properties of the company to be less than the first mortgage, a final compromise plan was worked out, largely between the Craigmyle and Harper Committees, upon the hearing of which no dissents were filed by any bondholders, the Craigmyle Committee filing acceptances on behalf of $146,000 par value of bonds.

Mr. Craigmyle testifies (page 244 and 245 of the Transcript of the Record) that there were four main differences between the original and the final plan—the principal ones being a change in the character of the bonds and a change as to management and control along the lines heretofore discussed in connection with the Harper Committee.

The Harper Committee strenuously urges that there was no such spontaneous opposition to the first Harper plan as

necessitated the formation of another committee. It appears from the record that at the time of the original hearing upon the original plan (excluding the Manufacturers Trust Company, whose indebtedness later was paid and whose bonds were held as collateral), the only dissents aggregated $156,000, more than half of which were held by the Trust Company of which Mr. Benjamin was president. Brief of counsel for the Harper Committee refers to certain exhibits, calling attention to the fact that as early as February, 1934, Louise Craigmyle was acquiring certificates of deposit which were subsequently transferred to H. P. Peters, who also dissented, it being insisted that, within the twenty days within which the Harper agreement of deposit provided for dissents, only the Trust Company in Scranton, holding $88,000 of the bonds and Mr. Van Alstyne, holding $3,000, dissented.

It is also urged that a large number of the later dissents were by those who had acquired their interest in the bonds subsequent to 1935, and that practically all dissents to the Harper plan, filed after July 11, 1934, were forwarded on forms prepared by the Craigmyle Committee and filed through the Craigmyle Committee. It is insisted that even though the members of the Craigmyle Committee did not individually purchase bonds or certificates of deposit, they represented a large number of people who did.

It is further insisted that no material changes were made by the Craigmyle Committee in the original Harper plan. In my opinion, without going further into the various contentions, the following may be taken as facts:

(1) The initial interest of Mr. Craigmyle and Mr. Van Alstyne arose because their customers were the owners of bonds, Mr. Benjamin being interested as president of the Scranton-Lackawanna Trust Company, which held a large number of bonds individually or as Trustee, such interest being personal and not for the benefit of the estate, I do not believe any activity before the formal organization of the Committee can be considered as a basis for allowance.

(2) I am convinced that a large number of the dissenting certificate of deposit holders acquired their interest after the litigation. A security holder who acquires an interest in the securities of a debtor corporation in process of reorganization and immediately objects to the plan of reorganization pending at the time of his purchase is upon a wholly different basis than an original security holder and his representatives upon a committee, or otherwise, have little standing to receive allowance for representing him.

(3) At the same time, the record does not disclose that all of the dissenting bondholders, represented by the Craigmyle Committee, were subsequent purchasers. For example, the bonds held by the Scranton-Lackawanna Trust Company were in dissent from the beginning. It is undoubtedly a fact that there was some opposition to the original Harper plan. It is also true that such opposition, as well as the opposition of those who later acquired their interest, was chiefly represented by the Craigmyle Committee.

There is much dispute as to the importance of the changes or amendments made in the original plan. Both the Harper and Craigmyle Committees made provision for participation in the reorganization by the stockholders. The ultimate plan eliminating such participation was under the findings and orders of the court itself. The original Harper plan provided for the payment in full of all indebtedness secured by collateral. The change in the original plan whereby the collateral was to be appraised and payment limited to the value thereof was undoubtedly an equitable amendment. It should be noted, however, that there was little or no dispute as to this change, when its propriety was called to the attention of the Harper Committee. There were various changes as to character of the securities. It is clear from the record, however, that the chief point of dispute was in the matter of control. The Craigmyle Committee was opposed to any voting trust, while the Harper Committee was insistent that there be a voting trust. In the course of negotiations, the nature and period of the voting trust was changed, and, whereas the majority of the voting trustees were originally contemplated to be members of the Harper Committee, in the final plan each of the two committees selected a trustee, the third member having no connection with either committee selected by the Court.

If the dispute between the Craigmyle and Harper Committees had consisted only of a dispute between different groups, or classes of creditors, there would be no basis

for allowance. In re 211 East Delaware Place Building Corp., D.C., 13 F.Supp. 473.

In my opinion:

(1) The Craigmyle Committee represented a substantial number of original bonds, although its representation was greatly augmented by those who had acquired securities after the litigation had been pending for some time.

(2) It was chiefly instrumental in bringing about certain amendments of substance in the plan, particularly with respect to the nature of the voting trust.

It, therefore, made some contribution to the final consummation of the reorganization, but I believe its allowance should be less than that of the Harper Committee. I believe it should participate to the extent of $5,500, which is allowed as compensation to the Committee.

■ Expenses claimed by the Committee aggregate $4,132.29, the great part of these expenses being two items of $2,000 and $533.20, respectively, compensation and expenses of W. C. Spooner, an engineer and geologist who made a valuation report of the Hamilton Gas Company and testified before the Special Master. This report was used in the course of the litigation in determining the issue of solvency of the debtor corporation. The amounts claimed are comparatively small, in relation to other engineering reports, for which claim is made, and will be allowed.

■ In the expense account are set out items aggregating $278.40, occurring prior to August, 1935, in which month the formal agreement of this Committee was drawn up, the last of these items being an item of expense on January 14, 1935, of $19.95. I do not believe that these items of expense are properly allowable, as in the first stages of the litigation the primary interest of the Committee was because of their customers' accounts, the interest of Mr. Benjamin being because of his bank's holdings. These items of the expense account from October 10, 1932, to and including January 14, 1935, cannot be allowed. The residue of the items in question amounting to $1,320.89 will be allowed, the aggregate of expenses allowed to this Committee being $3,854.09.

The fundamental basis of allowance to this committee of expenses is its contribution to the plan as finally adopted, and its participation is limited by the factors previously discussed.

Petition of Hines, Rearick, Dorr
& Hammond and Rummel, Blagg
& Stone.

These attorneys in associate representation of the Craigmyle Committee, claim an allowance to Hines, Rearick, Dorr & Hammond of $25,000 compensation, and $2,083.49 for expenses, and an allowance to Rummel, Blagg & Stone of $2,500, with a claim of $147.44 for expenses.

The petition alleges that six members of the first named firm, and nine associates, have worked on the matter at various times from February 1, 1934, through November, 1936, for a total of 1,293¼ hours, the firm of Rummel, Blagg & Stone working on the matter for a total of over 200 hours. For reasons heretofore stated, a record of this character while indicative of the activities of counsel is of little value in determining the amount of allowance.

The employment of Hines, Rearick, Dorr & Hammond commenced about February, 1934, and continued through to the end of the litigation. Until July 1, 1935, the most important service was the consideration of the Harper plan, but its major activities commenced after the determination of the jurisdictional controversy, about July, 1935. During the period of dispute between the Harper and Craigmyle Committees, these counsel were most active. The final agreement upon the compromise plan was undoubtedly greatly furthered by the efforts of Mr. Marshall, of the firm of Hines, Rearick, Dorr & Hammond.

■ As to the general activities of counsel any extended discussion is unnecessary, in view of the discussion as to the activities and results of the Committee itself. It may be said, however, that the record shows that these attorneys ably and energetically defended the interests of their clients. The factors of limitation operative with respect of the claim of the Craigmyle Committee, however, are likewise operative with respect of them. A portion of the activities of the members of the Craigmyle Committee during the receivership litigation antedated the employment of counsel, and a part of the activities of counsel during the years 1934 and 1935 antedated the formal organization of the Committee, and a small part of these services antedated the promulgation of the plan of June 21, 1934. Very little, if any, of these services furnish a basis for allowance.

Furthermore, it is the Court's duty to apportion an aggregate fee, reasonable for all services performed for a class of security holders, in this case the First Mortgage bondholders, whether performed by one or more committees, or one or more counsel, and to apportion that allowance among the proper participants. The fact that services in arriving at the final plan are performed by two committees instead of one, or by several counsel instead of a fewer number, does not warrant an increase in the aggregate fee, which must be based upon the reasonable value of the services as a whole, performed for the particular class of security holders involved. With this conception of the law and the duty of the Court thereunder, it follows that there may be, and doubtless in this instance were, many services for which the attorneys should look to the client, services that are proper and valuable, but not subject to allowance, either because of the foregoing and other limitations laid down in the decisions, or because they related to matters not for the general benefit of the estate. This position is strenuously opposed in the brief of Hines, Rearick, Dorr & Hammond, who argue that whatever amount is allowed to any committee or its counsel, should be in full payment for all services and expenses in connection with the equity proceedings, the 77B proceedings, and the plan of reorganization, and that neither a committee nor its counsel may look beyond such allowance for any further payments. Such would place upon the general estate the burden of paying for all services rendered by counsel to clients, whether the same were for the benefit of that estate or for the benefit of the particular group represented. It would be giving entirely too broad an interpretation to the statutory language "in connection with the proceeding and the plan". In this particular, I am satisfied that the true rule is that announced by Judge Chesnut In re Davison Chemical Co., D.C., 14 F.Supp. 821.

For the allowable services of Hines, Rearick, Dorr & Hammond, I am of the opinion that $17,500 is the proper amount.

With respect to the claim of Rummel, Blagg & Stone, it appears that they were retained in November, 1935, and acted as local counsel in West Virginia for the Craigmyle Committee, in association with Hines, Rearick, Dorr & Hammond throughout the later steps of the litigation. Counsel for the Trustees have noted in the record that they have checked over the appearances of these counsel, and, so far as the reasonableness of the claim is concerned, the Trustees take no issue, but raise the question that the estate is not liable. The services of this firm, as appears from the record, involve, in their virtual entirety, a direct participation in the litigation. For reasons stated in the discussion as to claim of the Craigmyle Committee, I cannot concur in the position of counsel for the Trustees that the estate is not liable. These attorneys were not retained until after the Committee had formally organized; they were frequently in court in matters directly relating to the proceedings and to the plan.

I do concur with the Trustees in the position that the amount of the fee is reasonable, and, having relationship to the proceeding and plan above noted, they should be allowed the sum of $2,500.

With respect to the expenses of these attorneys, the Trustees take exception in their brief to the last five items of the expense account of Hines, Rearick, Dorr & Hammond, totalling $877.22. The first of these three items consists of cables, telegrams and telephone toll calls. The parties in interest here were separated, and it seems to me that long distance telephone calls, cables and telegrams are proper items of expense. The other items objected to are overtime of employees on account of night work, car fare, postage and stenographic services. These are apparently a part of the office overhead of these attorneys. As stated by Judge Chesnut in Re Davison Chemical Co., D.C., 14 F.Supp. 821, at page 827 of the opinion: "And in measuring what is just compensation to lawyers in private practice, it must not be overlooked that allowances to them are not all net profit, as they are obliged to maintain offices with substantial overhead expense for the rent, telephone service, associate lawyers and clerks." The Court in fixing their allowance has taken into consideration these two items, and, therefore, they will not be separately allowed. The residue of the expenses, aggregating $1,380.43, will be allowed.

With respect of the expense account of Rummel, Blagg & Stone of $147.44, the Trustees in their brief take exception to the last four items aggregating $48.24. I concur only in the last item of postage, amounting to $7.15, which is in the nature of office overhead, and will not be allow-

ed. The residue of the expense account amounting to $140.29 will be allowed.

### Claim of W. A. Nash and Others, Members of the Woodward Committee of Independent Bondholders and Counsel for Said Committee.

Petition is filed seeking allowance for compensation to W. A. Nash, Elmer E. Powell and S. P. Woodward in the amount of $1,500, as a committee for independent bondholders and compensation in the amount of $7,500 for Holmes, Rogers & Carpenter, McNeill & McNeill, and Lee, Blessing & Steed, jointly, expenses and disbursements of counsel and Committee of $1,683.22, and for the payment of a note to the order of Thomas J. Barrett, who is recited as attorney for the Committee, now deceased, in the amount of $786.10, the aggregate allowance requested for these items being $11,469.32.

The petition alleges that the Committee was formed February 1, 1932, and thereupon became active, employing, in the early part of its existence, Mr. Thomas J. Barrett, who associated with himself, Mr. McNeill of the firm of McNeill & McNeill. It is stated that the Committee sent out many documents, statements, suggestions, summaries, etc.; that the Committee has been represented at all meetings before the Court with respect of the various plans of reorganization, generally by Mr. Steed, but at three of the meetings also by Mr. Robert H. McNeill. There have also been appearances before the Master. Petition further alleges that the Committee has incurred expenses of expert witnesses and requests allowance for the expenses and services of such witnesses.

Mr. Pfeil, associated with Mr. Barrett in other committee representation, testified to the effect that Mr. Barrett was affiliated with three different committees. It appears from Mr. McNeill's testimony that he did not become active until about a year and a half prior to his testimony, and until after the death of Mr. Barrett, that Mr. Carpenter stated to Mr. McNeill that prior to that time he had depended on Mr. Barrett to keep him advised as to the activities in West Virginia. Mr. McNeill testified to a number of letters written by this Committee, but states on page 288 of his testimony that all of the letters produced only a total deposit of $36,000 in bonds. He later testifies that the maximum representation of the Committee was $36,000 in bonds.

He testifies that efforts were made by his Committee to mollify the disputes and controversies between the bondholders. Mr. Steed testifies that some time in February, 1936, Mr. Barrett employed Robert Kay and himself as local attorneys for this Committee. Mr. Kay is making no application for allowance. It appears from the record that Mr. Steed attended various hearings on behalf of the Committee.

Mr. Steed testifies that on October 15, 1936, he was employed by Holmes, Rogers & Carpenter as local attorney of record for the Committee, it being stated to him that Mr. Robert H. McNeill of Washington, D. C., would have active charge of the case, and that since March, 1936, he has appeared in all hearings, his chief duties being to keep the chief counsel advised, his work being altogether with Mr. McNeill.

There is no question as to the activity of this Committee. It must be remembered, however, that it is a third committee, representing a part of a class of securities, the Harper Committee and the Craigmyle Committee being the active major committees, in representation of security holders of this same class. It represented a maximum of $36,000 of bonds par value, and there are indications in the record that there were withdrawals. The record does not disclose the initial reason for this committee. It was formed almost at the beginning of the litigation, and so far as the record discloses the initiating force was Mr. Barrett. Mr. Steed testified that in his opinion his clients' interest ran along pretty well with the interest of other first mortgage bondholders, and "for that reason it may not be said that we were so greatly useful in the case, but we had certain interests to protect". There is no question that Mr. Steed was present at many hearings and doubtless the other firms devoted time to this matter. Certainly, it would be entirely proper for any bondholders to employ attorneys to protect their particular interests, but certainly in such case such bondholders should pay for such protection, unless the attorneys rendered services beneficial to the estate as a whole. However, it is apparent throughout the record that during the period prior to June 21, 1934, when the first Harper plan was filed, the vast majority of bondholders were represented by the Harper Committee. So soon as the controversy with respect of that plan commenced, the Craig-

myle Committee became active and represented a large number of bondholders. Certainly between the two committees there was adequate representation of this class of securities.

The Woodward Committee represented, as above noted, a very small number of bonds, the maximum being $36,000 par value, the actual market value being much less. See In re Consolidated Motor Parts, 2 Cir., 85 F.2d 579.

While allowances may be made to those representing groups of creditors, they can only be for such services as are for the general benefit of the estate. See In re Middle West Utilities Co., D.C., 17 F.Supp. 359 and other decisions heretofore cited.

Certainly activities of this Committee would be duplication or multiplication of attorneys, in view of the major committees and their activities. Straus v. Baker, 5 Cir., 87 F.2d 401.

More participation in hearings, offering advice, suggestions or criticisms of the proposed plan are services for which an attorney should look to his Committee and not to the estate. Paramount Publix Corp., 2 Cir., 85 F.2d 588.

In view of these doctrines, no allowance may be made to this Committee or its counsel.

In the case of the attorneys in question, this necessary disallowance is no reflection whatsoever upon them, or their legal ability. It may frequently happen that a small group of bondholders may desire special representation, and such is their right and privilege, but if such group should look to the general estate for compensation for its attorneys, the inevitable result would be the parceling out of the assets of the debtor among an unnecessary number of attorneys and committees. There would be multiplication of work and unnecessary overlapping. When attorneys accept employment for a committee representing a small group, where there is previous adequate representation of the same class of securities by a committee or committees, representing the great majority of these security holders, it is only under the most exceptional circumstances and in the case of the most definite contribution to the success of the plan, neither of which is here apparent from the record, that they may look to the estate, and under ordinary circumstances must look solely to their clients for compensation.

Debenture and Unsecured Creditors.

The debenture and unsecured creditors are respectively represented by the Watters Committee and its counsel, and the Jamieson Committee and its counsel, all of whom are asking a total of $124,804.69, in addition to requests by two of the counsel for "fair allowances".

In considering generally allowance for this group, first to be considered is the aggregate value of the securities falling within this class. The outstanding debentures of the Company consisted of a par issue of $785,500 debentures.

Counsel for the Trustees, citing certain testimony in the record as to the current value of these secondary debts, insist that it is impossible to arrive at a higher valuation for the unsecured indebtedness greater in the aggregate than $75,000, yet those representing such unsecured indebtedness claim allowances and expenses in the total amount of $124,804.69, this figure not including the claims of Mr. Hindman and Mr. Pfeil, whose claims are not set out in terms of dollars in their petitions. The market value of the secondary securities in the course of litigation may not be taken, without reservation, as a criterion of the value. Such market value is depressed by the fact of litigation. There may be a potential value in a much greater amount dependent largely upon the success of the reorganization. While it is recognized that certainly the market value should not be unqualifiedly accepted, there is the further circumstance that the property covered by the First Mortgage, embracing virtually all the property of the Company, has been shown in this proceeding to be very much less than the aggregate amount of the First Mortgage. It, therefore, follows that the unsecured indebtedness, while not to be valued solely by the standard of market value, had less inherent value.

Allowances should bear a fair proportion to the amount of claims represented and certainly to the aggregate value of the securities forming the class. In re Consolidated Motor Parts, 2 Cir., 85 F.2d 579.

The recognition of this undoubted rule requires, as to all claimants within this classification representing the secondary securities, a drastic reduction in the amounts claimed. However extensive or efficient the services may have been, the

Court may make allowances only within the limits of the res involved. Here the very greatly depreciated secondary securities, the aggregate value of which, however liberally arrived at, is very small in comparison to the aggregate allowances claimed by the representatives of these security holders.

### Claim of the Watters Committee and Its Counsel.

This Committee claims allowances of compensation to its members, aggregating $30,000; to its Secretary $1,000; to its depositary, the First National Bank of Philadelphia, $1,700.60, and to an employee $300; aggregating $33,000.60, and expenses in the amount of $10,497.51. Counsel fees are claimed in the amount of $42,000 and $846.41 expenses.

The petition of the Committee alleges that it was formed on January 25, 1932, its agreement being dated January 28, 1932, with provision for depositing debentures with the First National Bank of Philadelphia, as depositary. This Committee has been active throughout the period of the litigation. It was one of the petitioning creditors in the 77B proceedings. It has always been a dominant committee so far as the amount of secondary securities represented is concerned. On November 9, 1937, in addition to approximately $33,000 of general creditors par value, it represented $601,000 par value of the debentures out of a total issue of $785,500, slightly less than four-fifths thereof. Throughout the litigation, it has been the policy of this Committee to cooperate closely with the Harper Committee. In brief of its counsel, it is stated that a close study of the legal phases of the situation led to the conclusion that the First Mortgage did, in fact, cover all of the assets and that in the event of a foreclosure the holders of the debentures and the general creditors would be completely wiped out. Evidently the Committee felt that the ultimate salvation of those it represented was more or less through the grace of the First Mortgage bondholders.

On the other hand, Mr. Hindman, of counsel for the Jamieson Committee, testified that "it was thought necessary to have an independent, unsecured creditors and debenture-holders committee that was not so closely tied up with the bondholders committee, that also had about 70% of the bonds."

The situation here presented, therefore, is of one committee strongly dominant in the matter of representation, cooperating with another committee, and another committee whose declared reason for existence, as stated by its counsel, was because of that relationship.

Mr. Watters testifies that he was "constantly sent to Charleston relative to physical matters, leases", etc., and that he was frequently consulted in matters of operation. Mr. Watters also testifies as to his participation in the discussion as between the Craigmyle plan and the Harper plan, and says that certain questions were considered under the Securities Exchange Law. This Committee also had the question of dissenting debenture holders. In six years two bonds were withdrawn. Mr. Watters testifies that Mr. Boal, of Tompkins, Boal & Tompkins, came to Philadelphia on several occasions for conferences, and at these conferences "we revised and revamped" this plan again and again, and the debenture holders and general creditors got more stock. This is significant as bearing upon possible allowance, not only to this Committee but to other committees representing this class of securities.

Mr. Watters testifies that he believes he had "1600 conversations with reference to the Hamilton Gas Company" and "500 conferences with our attorneys". Generally speaking, however, except as to certain matters of operation, the activity of this Committee in many particulars closely paralleled that of, and was in cooperation with, the Harper Committee, and an extended discussion of these activities is not necessary.

The final outcome, as testified to by Mr. Watters, was that each $1,000 of debentures or unsecured indebtedness was to receive between 33 and 34 shares of the common stock in the reorganized corporation. Mr. Watters testifies that there is no market value for that stock, but he believes it is worth "$8 or $10" under good management and decent gas conditions.

Mr. Hart of the firm of Hepburn & Norris, attorneys for this Committee, testifies at length. He speaks of many communications, papers prepared and considered, meetings, conferences, and general work. Questions under the Security Act, various appearances in court are noted, although he states as to the latter, that the burden of the hearings fell upon Mr.

Morris of Steptoe & Johnson. He speaks of participation in various hearings and preparation for hearings, both in New York and West Virginia, during the jurisdictional contest.

Generally speaking, many of the same considerations discussed with respect of the counsel for the Harper Committee obtain with respect of the services of counsel for this Committee, matters pertaining to the jurisdiction of this court, disputes as to dissenting bondholders and the like. The record does disclose, however, that a great deal of work was done by these counsel and this committee, much more work than the court could possibly make allowance for, in view:

(a) Of the limitations upon allowances referred to in discussion as to counsel for the Harper Committee; and

(b) The comparatively small value of the aggregate securities of the debenture holders and general creditors, even taking into consideration a possible potential value to those securities and not restricting them to mere market or inherent value.

### Jamieson Committee.

Claim is made by a committee composed of Stewart Jamieson, John K. Blair and Ambrose C. Hindman, as a committee for debenture holders and unsecured creditors in the amount of $4,211.44 expenses, and compensation to Mr. Stewart Jamieson and Mr. Hindman of $7,000; to Mr. Lawrence Eckman, Secretary, of $500; to Mr. Hindman as counsel a "fair allowance"; and to Mr. Pfeil a "fair allowance"; to the estate of Thomas J. Barrett for his services as counsel $10,000; to Tompkins, Boal & Tompkins; R. E. O'Connor and A. G. Thompson for services $15,000 and $1,718.73 expenses.

The petition of the last named attorneys is entitled as being for the Independent Bondholders and Unsecured Creditors Protective Committee, but the record shows that all of these services were for unsecured creditors, including debenture holders.

Tompkins, Boal & Tompkins, and Messrs. O'Connor and Thompson took no active part in any of the court proceedings in the years 1934 and 1935, their petition stating that the legal work of the Committee was handled in West Virginia by Thomas J. Barrett and Samuel T. Spears until the time of the respective deaths of the latter.

In the early part of 1936, Mr. Boal was consulted by Mr. Jamieson and Mr. Hindman in reference to the plan of reorganization. In March, 1936, after the deaths of Messrs. Barrett and Spears, he referred Mr. Hindman to Messrs. O'Connor and Thompson and the latter represented the Committee at the hearings before the Court in March, 1936, and appeared at all subsequent hearings.

It appears from the petition of the Committee that it was organized in the spring of 1932, "at the request of sundry unsecured creditors". It was reorganized about June, 1934, at which time Mr. Hindman says he became a member. It seems that Mr. Jamieson was always a member of this Committee. Originally, Mr. Snaith and Mr. Cummings were members and, at the time of its reorganization, Mr. Hindman was contacted by Mr. Barrett and Mr. Jamieson, perhaps by Mr. Barrett first. He states that he never met Mr. Blair.

Mr. Pfeil testifies that in the fall of 1933, he was engaged as Mr. Barrett's attorney in various matters, and at the time the latter said that he was embarrassed on account of the unsecured creditors committee because two of the members had resigned or died. Mr. Pfeil states that Mr. Barrett was the author, but not the exclusive author, of the letter sent out by this Committee during his lifetime. He also testifies that he presumes that Mr. Barrett was very anxious that these committees be created.

It is apparent and the inference is inescapable from a consideration of the whole record that this committee was another committee initiated by Mr. Barrett; that it underwent almost complete reorganization in 1934, and until the commencement of 1936, its efforts consisted almost exclusively of circularization of various unsecured creditors.

The expenses of the Committee largely consisted of payments to Mr. Barrett, printing letters, etc. The circular literature that the Committee sent out affirmatively indicated that the security holders were to be placed at no expense and that whatever compensation the committeemen or its counsel should receive would be paid by allowance of the Court. This circumstance of itself would cause the Court to scrutinize the matter of allowances with great care. As said by Judge

Hamilton in the opinion In re Kentucky Electric Power Corp., D.C., 11 F.Supp. 528, at page 532 of the opinion: "In letters mailed to the owners of the bonds seeking deposits with the committee, no statement was made that the committee intended to charge for its services. Under these circumstances the court should exercise the utmost care in making any allowance whatever to the committee."

A careful consideration of the record leads me to two conclusions:

(1) Prior to March, 1936, the activity of this Committee consisted chiefly of circularization of security holders and unsecured creditors, conferences, and the like;

(2) The above activities were at a time when there was little dispute among the security holders and when the Watters Committee represented the very great number of such unsecured creditors.

It follows that the services during this period did not contribute such benefit to the estate as make them the proper subject of allowance.

In March, 1936, Messrs. O'Connor and Thompson were employed, Tompkins, Boal & Tompkins having been likewise retained shortly prior thereto. The two local attorneys attended the hearing of March 26, 1936, which lasted four days. Exceptions were prepared to the Broun report, and in June, 1936, Mr. O'Connor, Mr. Thompson and Mr. Boal attended the hearing. From the approval by the Court of the plan then under consideration, these attorneys, on July 20, 1936, obtained an appeal. It was later dismissed. There were various appearances in court by these attorneys. Mr. Thompson outlines numerous appearances in court and before the Master, all of which cumulated on November 9, 1937, when acceptances of the final plan of a number of unsecured creditors were filed by him. Mr. O'Connor's testimony was confirmatory of that of Mr. Thompson. There was evidently some disagreement as to policy, Mr. Thompson testifying that Mr. O'Connor, Mr. Boal and he thought it would be a waste of time to develop certain ideas in the case which Mr. Pfeil thought could be developed and on which Mr. Pfeil spent some time.

Mr. Boal testifies as to certain hearings and generally is confirmatory of the testimony of Mr. Thompson. He goes more

into detail as to the argument on the question of insolvency at Asheville in June, 1937. After the determination of this appeal, and in the final stages of the litigation, Mr. Boal details changes that were made in the plan through discussion and meetings with the Watters Committee and other parties. Mr. Boal states that the total of common stock to be issued was not to be increased, but that the percentage of the total the bondholders were to receive was reduced from 69 to 64% and the stock going to the unsecured creditors was increased from 26 to 36%, an increase in the amount of stock which they were to receive of about 40%.

The Committee following the employment of Messrs. Tompkins, Boal & Tompkins and Messrs. O'Connor and Thompson changed its policy and through said attorneys, and virtually entirely by them, performed two classes of service as to which some allowance would be proper:

(1) Appearances in Court on matters relating to the plan; and

(2) The procurement, along with the Watters Committee, of a liberalization in the final plan for the benefit of this class of securities.

Mr. Watters' testimony is confirmatory of the cooperation between the two committees, at least in the latter particular. It is to be noted that these results were virtually entirely attributable to the activity of Mr. Boal and his associates, Messrs. O'Connor and Thompson.

Mr. Pfeil, one of the attorneys for this Committee, and Mr. Hindman, a member of the Committee, who also rendered services as counsel, were active and indefatigable, but it appears from the testimony that such services were chiefly of a character not contributing to the benefit of the estate or the furtherance of the plan of reorganization.

In my opinion, various attorneys representing this Committee have been very active, but the only part of the activity which was for the general benefit of the estate and furtherance of the plan and proceedings was accomplished almost entirely by Messrs. Boal, O'Connor and Thompson, in procuring the modifications of the plan as above noted.

Considering all of the parties, committeemen and counsel representing this class of security holders and their counsel, there has been very extensive activity,

much of it not within the scope for which allowance can properly be made, but a considerable amount of it, in the case of attorneys, Hepburn & Norris, Tompkins, Boal & Tompkins, O'Connor and Thompson, and in the case of the Watters Committee is within the scope of services for which allowances may properly be made.

The comparatively small aggregate value of the securities represented, however, is a factor that cannot be escaped, and as such limits the amount of the allowance, any amount above that being a matter between private clients and their attorneys, and, considering all of the complex and difficult situations, proper allowances for all the services of the two committees and of their counsel for this class are as follows:

To Watters Committee...................... $10,000.00
To Hepburn & Norris, counsel for Watters Committee ......................... $15,000.00
To Jamieson Committee for services after March, 1936, any prior activity being unallowable, (such amount includes the services of Mr. Eckman, as secretary, and of Mr. Hindman as a member of the Committee and as counsel, and expenses) $ 500.00
To Tompkins, Boal & Tompkins, and O'Connor and Thompson........................ $ 2,400.00
To Mr. Pfeil ................................. $ 200.00

### Expenses.

Coming to the expenses asked by these various attorneys and committees, I shall first consider those of the Watters Committee. This committee had comparatively little conflict with other committees and security holders, as was the case with the Harper Committee, although it cooperated closely with the latter.

The first item is one of $1,833.33, being one-third of $5,500 which had been paid by the Harper Committee to W. A. Larner, the Watters Committee reimbursing the former Committee to the extent of the said one-third. For reasons stated in disallowing the Larner expenses of the Harper Committee, this sum may not be allowed.

The amount claimed of $876.41 for attorneys' costs will be allowed.

The next item is advertising $220.07, which is allowed.

The next item is that of $1,302.55, of which all but $13.38 are payments to E. McLain Watters. If I understand correctly, this is the proportion of the current expenses of Mr. Watters charged to the Committee. This, to my mind, is a parallel to the office overhead in the case of lawyers. It should be, and has been, taken into consideration in allowances made, and should not be the subject of individual expense allowance. Therefore, all of this item will be disallowed, except $13.38 which will be allowed.

The next item of this claim is that of $2,457.98 interest. This stands upon the same footing as interest paid by the Harper Committee, heretofore discussed, and for reasons stated in that discussion cannot be allowed. The item of miscellaneous expenses, aggregating $241.40, listed with the petition, is allowed.

There is listed in detail an item aggregating $215.10 for postage. Ordinarily postage is a part of office overhead, the payment of which should be considered, and has been considered, in making allowance. There are special items of postage, however, for the mailing of particular specified circulars and letters of substantial amount. These specified items consisting of $5.33, $30, $18, $3 (for postals), $7.25, $60, and $39.34, appear to be unusual items of postage and in their aggregate amount of $162.92 will be allowed.

An item aggregating $1,026.99 for printing is claimed. Most of the items of this are for circular letters, postals, original agreement of deposit, and plan of reorganization. A considerable amount of this account is prior to the 77B proceedings, but prior to those proceedings this Committee was the dominant committee of these security holders, and certainly some of its services would fall within the classification of those for which allowance may be made, even though antedating the actual filing of the bankruptcy proceeding. Some of these expenses were doubtless in connection with disputes similar to that of the Harper Committee as to withdrawals of deposits and the like, and some of them would not be allowable. Two-thirds of this item, viz., $617.98, will be allowed.

The item of $1.66 federal check tax will be allowed.

The item of telephone toll charges and telegrams, amounting to $149.88, will be allowed.

The transfer fees of the depositary in the amount of $238.30 will be allowed.

Traveling expenses of $1,884.24 are claimed and will be allowed.

 A claim of $1,700.60 is made for services of the First National Bank of Philadelphia, as depositary. Counsel for Trustees in their brief insist that this item should be reduced approximately one-half under the principle laid down in United Cigar Stores, D.C., 21 F. Supp. 869. The bill of this Bank reflects $1 for holding 563, $1,000 bonds, and 75 cents for 500 bonds, and 25 cents for 344 certificates of deposit. There is also an item for ten per cent for supervision, $74.25, and an item of $120 a year for custody and an item of $100 for special clerical services. The items of 10 per cent for supervision of $120 custody and $100 special services will be eliminated. These items aggregate $894.35. The residue of this depositary charge, amounting to $806.35, will be allowed. The total expense allowances to the Watters Committee aggregate $5,212.59.

 The Jamieson Committee has filed expenses aggregating $4,211.44, the greater portion of this expense being an item of $880.88 for printing letters, etc., $251.09, mailing and postage, expenses trips for Mr. Hindman and Mr. Pfeil, traveling expenses and disbursements. As heretofore pointed out, the activities of this Committee prior to March, 1936, were, in my opinion, not of such nature as to be within the rules with respect of allowance. This eliminates much the greater part of this expense account. Mr. Hindman's and Mr. Pfeil's efforts were largely duplicated by those of other attorneys. The dates of Mr. Hindman's trips do not appear. With respect of him and Mr. Pfeil, it is not possible to make determination as to the exact character of the trips. The record discloses that very much the greater part of the activities of this Committee were not such as would be proper subject of allowance. Only in the later stages did its counsel procure any beneficial modification of the plan. Because of these circumstances and the great duplication of counsel, it would be improper to allow the expenses of these attorneys in full. In consideration of all of this, an allowance is made to Mr. Hindman and Mr. Pfeil the sum of $200 each, on account of these expenses, allowance of the residue of their claims for expenses being refused.

 There has also been asked by this Committee an allowance to Lawrence Eckman, as secretary, of $500. This is not allowed as a separate item, any payments to the secretary being comprised within the allowance to the Committee.

There is also asked an allowance to the estate of Thomas J. Barrett for services in the sum of $10,000. Mr. Barrett died early in the year 1936. A careful examination of the record up to that time shows that the Watters Committee represented a much greater number of debenture holders; that there was no activity and no accomplishment of this Committee which would justify allowance either to the Committee or its counsel prior to March, 1936. Accordingly, this allowance is refused.

While no formal petition has been filed, it appears that Mr. Samuel T. Spears, in the early stages of the litigation, was associated as counsel for this Committee. The consideration that precludes allowance to the estate of Mr. Barrett precludes any allowance to the estate of Mr. Spears.

Although I have not determined these matters upon technical grounds, it may be stated that the general orders in bankruptcy with respect of affidavits required have not been complied with by certain of these attorneys.

Hepburn & Norris, counsel for the Watters Committee, recited in their petition expenses of $876.41 which has been paid to them by their committee, and has been allowed in reimbursement to the Committee.

Tompkins, Boal & Tompkins, and R. E. O'Connor and A. G. Thompson asked for expenses aggregating $1,718.73. All of the services of these attorneys arose after March, 1936, and the items of expense relate almost entirely to traveling expenses of Mr. Boal and to costs with respect of the record in the Circuit Court of Appeals on appeal, and these expenses are allowed.

## Claims for Services on Behalf of Common Stockholders.

There have been filed petitions for allowances on behalf of committees for the

common stockholders for services and expenses as follows:

| | | |
|---|---|---|
| Austin Agnew, member of the Agnew Committee for Common Stockholders ...................... | $ 1,000.00 | |
| E. C. Parsly, member of Committee for Common Stockholders.... | 500.00 | |
| William M. Chadbourne, counsel for Agnew Committee for Common Stockholders ............... | 17,500.00 | $4,021.02 |
| Price, Smith & Spilman, services as counsel for Agnew Committee for Common Stockholders........ | 2,500.00 | 180.80 |
| Harry M. Blair, Robert Owston and Joseph Walsh, Committee of Common Stockholders. | "Fair Allowance" | 2,063.55 |
| Poffenbarger & Poffenbarger, counsel for Blair Committee | "Fair Allowance" | |
| George Pfeil, services as counsel | "Fair Allowance" | |

In addition, Albert L. Cox claims compensation for services in the amount of $2,-400. The petition, as filed, presented this claim as counsel for debtor, but later Mr. Cox corrected this, stating his appearance was in behalf of a committee of common stockholders.

Any consideration of the reasonableness and the amount of allowance on these claims is pertinent only if, as a matter of law, the applicants are entitled to allowance from the estate. Originally, the plan of reorganization presented provided for a limited participation in the reorganized company by the common stockholders. The Bankruptcy Act, in its reorganization provision, places the duty upon the Court to determine the fairness of any plan of reorganization, and clearly imposes the duty of preventing the issuance of valueless securities which may later be sold to the public. The Court was confident in this instance that there was no equity for the common stockholders; that the value of the property of the debtor corporation was not sufficient to pay the claims of creditors. From the first holding of the Court in this particular, an appeal was taken, the Circuit Court of Appeals remanding for further proof, and extensive proof was taken, it being found that the value of the property, exclusive of cash in the hands of the Receivers, was only $1,600,000. This holding has become final, and it is a matter of adjudication that the Company was insolvent and that there was no equity for such common stockholders. It is urged, nevertheless, that the common stockholders in raising the question of insolvency performed a necessary function; that it was the duty of the Court to determine the issue of insolvency; and that it could not intelligently determine the same without a presentation of the facts, which presentation these committees brought about. Such reasoning overlooks the fundamental principle that an allowance in order to be justified must be for services beneficial to the estate. Furthermore, the funds available to the Court, from which allowance could be made, proceed from property, and the operation of property, that in equity belonged to the bondholders. To make allowance to the representatives of the common stockholders would amount to diverting for their benefit funds in which they, by adjudication of this Court, could not have had any interest.

It is doubtful whether the amendment to the Bankruptcy Act in 1938, the so-called Chandler Act, if applied to this proceeding would materially change the criteria by which allowances should be made. Counsel for the Agnew Common Stockholders' Committee and certain other counsel strongly urge the contrary. Particularly counsel for the Agnew Committee urge that services as such counsel for such committee were "beneficial in the administration of the estate", and, accordingly, compensable under the Chandler Act, if that Act apply. While I am of the opinion it is not proper to apply the Act in this case, it is worthy of consideration whether or not, if the Act did apply, these services rendered by these various committees for the common stockholders would be beneficial to the estate. Simplified, Section 243 of the Act of June 22, 1938, 11 U.S.C.A. § 643, permits reasonable compensation for services rendered and reimbursement for proper costs and expenses by stockholders and attorneys for them, not only in connection with the plan and in connection with objections by them to the confirmation of the plan, but in connection with the administration of the estate; but it is further provided that in fixing such allowances the Judge shall give consideration only to services that fall in one of the three following classifications:

(a) "contributed to the plan confirmed";

(b) "contributed to the refusal of confirmation of a plan";

(c) "were beneficial in the administration of the estate".

Considering now the supplemental brief of the Agnew Common Stockholders' Com-

mittee. Applicant in the Algiers case, relied upon by petitioners, and heretofore referred to, conceded that the Committee and its counsel were entitled to no compensation under section 77B—this was because an order of liquidation was entered. Therefore, they rely on Section 246 of the Chandler Act, 11 U.S.C.A. § 646, namely: "Upon * * * the entry of an order adjudging the debtor a bankrupt, the judge may allow reasonable compensation for services rendered * * * prior to such dismissal or order of adjudication * * * as provided in this chapter". The Act provides for compensating services rendered in reorganization proceedings that fail and end in bankruptcy—which is ˜contrary to holding of the courts before the enactment of Chandler Act.

The supplemental brief contends that Section 243 "shows clearly that Congress in using the disjunctive 'or' referred to three categories of services for which committees and their counsel can be compensated". (See (a), (b), and (c), above)

This quotation from the brief, page 6, to-wit: "It is obvious that Section 243, which specifically refers to services bene-fiting the administration of the estate, refutes the argument made by special counsel that the Agnew Committee and its counsel must have contributed to the plan in order to receive compensation", manifestly is an admission that the Agnew Committee and its counsel did not contribute to the plan. Therefore, we may dispense with the further consideration of the aforesaid (a) and (b), leaving for consideration the following questions, arising under (c), to-wit:

1. Can any of the services performed by the Agnew Committee and its counsel and other stockholders committees be properly classed as "in the administration of the estate"? (See (c), above.)

2. If so, then were those services "beneficial"?

Assuming that the clause in (c) with reference to the "administration of the estate" not only applies to and includes liquidation and bankruptcy but applies equally well to reorganization proceedings, we have as the only services performed by the Committee and its counsel the fact that they made "the insolvency hearings an adversary proceeding"; and in their unsuccessful attempt to sustain their so-called adversary proceedings, they claim to have "presented to the Court complete and valu-able information with respect to the value of the debtor's property." Were such services beneficial? Is it a proper test to ask—Was their so-called "adversary proceeding" essential or necessary to enable the Court to obtain information with respect to the value of the debtor's property? Would it have any bearing on the question under consideration as to whether the Court could or could not have arrived at the value of the debtor's property without the so-called adversary proceeding and by a method more expeditious?

As a matter of fact, in the opinion of the Court, it became apparent in the early stages of the record that the company was insolvent, the so-called adversary proceeding of the common stockholders resulting only in more proof being taken, but with the same result obtained.

Counsel for the Agnew Committee in their supplemental brief urge that by Section 243 of the Chandler Act, "the arguments made by special counsel in opposition to the application of the Agnew Committee and its counsel are completely nullified."

"Special Counsel, in its brief, contend the services must '(a) have been for the direct benefit of the estate, and, (b) have contributed to the ultimate plan' ".

What would be the excuse for any services that did not, at least in some degree or manner, contribute to the ultimate plan—the ultimate plan being the objective of the reorganization proceedings, and again, would not anything that benefits the administration of the estate manifestly be "for the direct benefit of the estate"? The so-called "adversary proceedings" were absolutely and entirely not only for, but intended for, the common stockholders—not in furtherance of facilitating or expediting the administration of the estate or the furtherance of any plan. The so-called "adversary proceeding" was, in reality, an unsuccessful attempt to acquire from or force from the bondholders, etc., property rights that the Agnew Committee stockholders were in this debtor proceeding under the circumstances not entitled to (and the Courts so held).

The practical effect of these activities on behalf of the common stockholders was not to further the administration of the estate, but to delay the consummation of the plan. Such services were not beneficial in the administration of the plan. No criticism of the committee or its attorneys is intended. With that optimism characteris-

tic under the circumstances, the common stockholders and their representatives may, and doubtless did, consider that they were entitled to participate in the benefits of the reorganization. They had a perfect right to have their contention presented to the Court. It was ably and efficiently presented. Such presentation, however, not contributing to, or benefiting the estate, should be paid for by the litigant parties and not out of an estate which essentially belongs to the creditors. It is therefore concluded:

(a) That the amendment of June 22, 1938, to the Bankruptcy Act should not be applied to this proceeding, and, under the law as it stood prior to that date, there is no question in my mind that these services did not benefit the estate and did not contribute to the ultimate plan of reorganization and are, therefore, not allowable.

(b) If the amendment of June 22, 1938, were to be applied, such services were not such as could be regarded as beneficial in the administration of the estate and as would justify allowance even under the Act as amended.

In view of the Court's conception of the law, counsel must look to their clients for reimbursement, as no allowance may be made to this class from the estate.

### Supplemental Petition for Allowance to Blair Committee and Its Attorney.

On August 25, 1938, Mr. Pfeil transmitted a supplemental application for allowance by the Blair Committee, his associate attorneys and himself. In the verified supplemental application, Mr. Blair set forth that immediately subsequent to September, 1937, the Committee learned certain facts which it considered its duty to bring before the Court, also making application for leave to appeal from the order confirming the reorganization plan, and that the Committee made application for writ of certiorari to the Supreme Court of the United States. The application sets forth at least fifty conferences of Mr. Pfeil and others. It includes a bill for expenses of $607.12, chiefly with respect of application for appeal and in connection with certiorari in the Supreme Court.

Mr. Pfeil files his verified petition, setting out that the Committee had filed a motion to remove the bankruptcy trustees and to investigate the equity receivers, for a new consideration of the plan of reorganization, and to investigate the Harper Bondholders' Committee, the Watters Committee and the Craigmyle Committee. The petition states that Mr. John L. Clark and George Copeland had been associated with him in this work in court. The petition sets out the applications for appeal to the Circuit Court of Appeals, for writs of certiorari in the Supreme Court of the United States, hearings in Charleston, etc. He requests a fair and reasonable allowance to his associate attorneys, the Committee and himself 'for the services rendered, and states that although the Court found against his Committee, the circumstances and facts in the case were such as to justify the attempt to bring these issues before the Court. The affidavit of Mr. Clark, with minute detail as to time spent, is also filed. All matters covered by these petitions were subject to extensive hearings in Court. There is no question that services were performed. It is only a question of whether they are of such nature that allowance may be made for them or for the expenses incident to them.

With respect to the petitioner's motion to remove the Trustees, the Court, it will be remembered from the memorandum decision heretofore filed, ascertained that the proceeding was wholly unjustified and without foundation, either in fact or in law. The other efforts, in addition to certain matters sought to be brought against other committees, consisted of an attempt to show that there was a large value or equity in the Hamilton Gas Co. properties, mainly because of certain contracts for the sale of gas which that company had, and it was accordingly sought to set aside the confirmation of the plan of reorganization and reopen the whole matter. Most of the matter presented had, in fact, been previously presented before the Special Master, and the major part was available to the Court prior to the confirmation of the plan of reorganization. In the opinion of the Court, no showing was made upon these proceedings that justified the remedy sought, and it was so decided. Appeals and application for certiorari were prosecuted. Again it may be said that the courts are open to any person, or group of persons, believing themselves aggrieved, but mere activity in a proceeding of this character furnishes no justification for allowance. These proceedings did not contribute to the plan consummated, and conferred no benefit on the estate. So stringent is the

rule that only contribution to the plan or benefit to the estate as a whole furnishes a proper basis for allowance that it has been held that even successful opposition to a 77 B proceeding, resulting in final rejection upon appeal of a plan approved by the District Court, furnishes no proper ground for allowance. In re Nine North Church Street, 2 Cir., 89 F.2d 13.

Certainly no part of this activity contributed any benefit to the estate, or was even beneficial in the administration of the estate if the later amendment to the Act were to be applied. The major part of such activity took place after the final confirmation of the plan, and the appeal from that final confirmation was unsuccessful. It accordingly follows that no allowance with respect of these supplemental applications may be made.

Allowances Respecting Services and
Expenses Relative to the Delaware
Receivership.

Allowances, respectively, of services and expenses relative to the Delaware receivership are requested as follows:

| | | |
|---|---|---|
| W. A. Larner, services as Receiver in Delaware receivership | $12,500.00 | $5,002.77 |
| A. F. Crichton, services as Receiver in Delaware receivership | 2,500.00 | |
| Richards, Layton & Finger, services as counsel for Receiver in Delaware receivership........... | 2,500.00 | 89.09 |
| Smyth & Tuttle, services as counsel for Receivers in Delaware receivership ...................... | 10,000.00 | 716.74 |
| Frank L. Speakman, services as counsel for Debtor in Delaware receivership ...................... | 250.00 | |

In November, 1937, Mr. Larner, with Smythe & Tuttle and others, made application before the Honorable John P. Nields, United States District Judge in Delaware, for allowances with respect of the Delaware receivership, and a copy of this proceeding and of Judge Nields' order are before the Court. It was admitted at the hearing that the final determination of these allowances, by their validity and amounts, must be determined by this Court. Such, of course, necessarily follows, because of the pendency of virtually all of the litigation in this Court. The debtor was incorporated under the laws of the State of Delaware, but it was admitted that there was no property or operations in Delaware, except the contents of a safety deposit box. Mr. Finger, representing the debtor, states on page 18 of the Delaware transcript that the Court having charge of the 77B proceeding is expected to review the allowances made by the trial court. It is the duty of this Court, because of its being the seat of the litigation, to do more than review—to consider these allowances, in effect, de novo. In doing so, it is recognized that Judge Nields necessarily would have little knowledge of the litigation and the circumstances attending it, and, therefore, it reaching contrary conclusions with respect of these allowances, there is certainly no thought of criticism, or even disagreement with Judge Nields, so far as the record before him at the time is concerned.

In considering Mr. Larner's petition as Delaware Receiver, it should be noted that he has heretofore been awarded and paid the sum of $5,000 by this Court. Mr. Larner makes claim for allowance (otherwise than as New York Receiver, for which claim has been withdrawn)—

(a) For services performed as Delaware Receiver from the inception of the receivership until June 7, 1934, the date of the filing of the 77B proceeding;

(b) From June 7, 1934, for services as President of the Debtor.

He testifies with some detail that for the period following the receivership, he devoted all his time to this matter, including Saturdays, Sundays and holidays, except a few hours, his work falling in many classifications, including aiding in the organization of the West Virginia receivership; working with committees, numerous negotiations looking to refinancing the company, work with respect of gas contracts, etc.

On December 16, 1933, Mr. Larner and Mr. Crichton, as Receivers of the debtor corporation in Delaware, filed their petition asking for out-of-pocket expenses of $8,474.91 and an ad interim allowance of $9,000, allowance being made and paid to the extent of $5,000, as hereinbefore set forth.

Subsequently, the 77B petition having been filed, Mr. Larner became very much interested in the maintenance of the jurisdiction of these proceedings in New York, the issue there turning upon the principal place of business of the debtor for six months next preceding the filing of the petition. On February 18–20, 1935, a hearing to determine the location of this principal place of business was held in this Court, the transcript being filed on March 20,

1935. On page 393 of the transcript of that record, Mr. Larner, who had also been appointed Receiver in New York, states that there was practically no activity in that receivership and further states "my activities were that of President of the Company, and I endeavored to protect the equities and procedure and procure a reorganization."

It was apparent from this record that Mr. Larner had previously claimed compensation for these activities as Receiver in Delaware, presenting petition for allowance, and later claimed them as activities as president of and on behalf of the debtor. This came to the attention of this Court in Watters v. Hamilton Gas Company, D.C., 10 F.Supp. 323, 330, from which I quote: "Later, during the year 1933, he filed a sworn petition with the Delaware court setting up his activities as receiver, pointing out that between January 18, 1932, and the date of his petition, he had spent 186 days outside of these offices in travel as receiver of that court, and averring that all his time had been spent in the business of the receivership. In such petition he also claimed as receivership obligations all the expenses of maintaining the office in the Greybar Building, including service charges, telephone and telegraph, and the salaries of such clerical help as he had kept about him there. Subsequently a claim was filed in this jurisdiction for the payment of such expenses, as well as fees as Delaware receiver. At the hearing in this proceeding every item of expense alleged by Larner to have been made for the company in maintaining the New York office was shown upon cross-examination to have been included as expense incurred by him as receiver in Delaware. Thus the mantle of the Delaware receivership, which was donned for the purpose of justifying the allowance of expenses by this court in the equity proceeding, is now doffed for the more convenient mantle of president of the company in order to give color to the claim that the company maintained a place of business in New York during the statutory period. The inconsistency between these positions is so apparent as to make the conclusion inevitable that the witness conceived his own activities to be nothing more nor less than the principal business of the debtor."

Mr. Larner is again claiming that his activities during the period from the inception of the receivership to the filing of the 77B proceeding were attributable to the Delaware receivership—seeking to sustain that position by a provision in the Delaware order of appointment, authorizing him to negotiate with creditors and to report to the Court. No report of any plan of reorganization was made to the Delaware Court. The Delaware receivership had no physical property other than the contents of a safety deposit box.

▪ In August, 1932, the foreclosure proceeding was filed in this Court. All operations were in West Virginia and Kentucky, and any questions that would come up with respect of the Delaware receivership would be necessarily legal questions. Certainly, any activities of Mr. Larner during that period and any expenses to which he may have been put as Delaware Receiver, are amply compensated for by the $5,000 previously allowed him, and no further allowance is made to him in this capacity.

▪ Included in the petition is the claim of A. F. Crichton for services as co-Receiver with Mr. Larner in Delaware in the amount of $2,500. Mr. Crichton testifies that he thought that the receivership was from January 18, 1932, and that his last act in the receivership was in 1934, but his counsel looked after the matter. He made delivery of the contents of the safety deposit box, had conferences with Mr. Larner and with attorneys, gave bond for $40,000, which later was reduced to $1,000, and still later discontinued. He stated that, up to the time the Trustees were appointed in the 77B proceeding, he "was very much interested in the receivership."

In my opinion, the services performed as Delaware Receiver by Mr. Crichton were limited and of virtually a nominal character, and a proper allowance to him would be $250.

▪ Claim is also made by Richards, Layton & Finger for services as counsel for the Delaware receivers in the amount of $2,500 and expenses of $89.09; by Smyth & Tuttle for services as counsel for such receivers of $10,000 and expenses of $1,716.79 and of Frank L. Speakman for services as counsel in the amount of $250.

Again it is necessary to revert to the rule that duplication is no ground for increase of aggregate fees. It appears that the bulk of the work properly chargeable to the receivership was done by Smyth & Tuttle. Mr. Finger testifies that his firm

prepared the decree appointing the receivers, a consent decree, and throughout the receivership was called upon from time to time to prepare petitions and reports to the Court, the receivership extending about two and one-half years, and that after the 77B proceedings were instituted they were consulted from time to time as to various matters concerning closing up of the receivership. They participated in no litigation and state that the petitions and reports filed were not numerous, but that there was considerable correspondence.

These attorneys will be allowed the sum of $589.09 to cover fees and expenses.

With respect of Frank L. Speakman, Mr. Finger testifies that he appeared as counsel for the defendant; that he stated that he preferred not to ask any specific amount. The record before me is not sufficient to determine these services, but they were certainly of the most nominal character, and an allowance of $50 will be made.

■ With respect of the claim of Smyth & Tuttle, as counsel for the Delaware Receiver, Mr. Tuttle testifies that prior to the receivership his former connections had been as New York attorney for the debtor corporation. At the inception of the receivership, he testified that he performed the usual routine services, one of the important matters to be considered at that time being the situs of the choses in action of the debtor, particularly with respect to a claim against the Inland Gas Company. This firm's chief activities, however, appear to have been the various negotiations with the Harper Committee, with the Manufacturers Bank, and various negotiations looking to rehabilitation of the Company.

It seems clear that very much the greater part of the services of Smyth & Tuttle, during the period of the receivership, were not attributable to the Delaware receivership. It is urged that the services to the Delaware receivership were performed, pursuant to the direction in the order of the Delaware court, under which the receivers were authorized and directed to consult with the creditors and stockholders with reference to the matter of reorganization, and after such consultation, if it should be deemed advisable, they were authorized to report to the Court a plan for the reorganization of the defendant corporation. Such a provision is usual in orders of this character. It certainly would not justify, as part of receivership activity without report to the Court, activities as wide spread as those of Mr. Larner and his attorneys and their attempts at reorganization, however advisable and justifiable those activities were from the viewpoint of Mr. Larner as a stockholder of the debtor corporation. Furthermore, while the West Virginia receivership was ancillary to that of Delaware in the sense that the former jurisdiction was the state of incorporation of the Hamilton Gas Company, all of the actual physical property of the Company, except a negligible amount, was in the hands of the West Virginia and Kentucky receiverships, and in August, 1932, approximately six months after the institution of the receivership proceedings, foreclosure proceedings were instituted in this state.

For the services of these attorneys to the Delaware receivership, to cover compensation and expenses, an allowance of $2,716.74 will be made.

### The New York Receivership.

With respect to the New York receivership, Smyth & Tuttle ask for services as Special Counsel in the case of Starring Company v. Hamilton Gas Company, $5,000, and expenses of $126.82.

■ The Irving Trust Company has filed no formal petition in this Court, but a claim has been made by it of $1,000 as New York Receiver, the New York Court referring all matters to this Court. Its services as Receiver were extremely nominal and the amount of $250 will be allowed.

A corresponding request for allowance by Mr. Larner as New York Receiver has been withdrawn.

■ With respect of the special services in the Starring litigation, that suit was started against the Hamilton Gas Company on April 29, 1931. Jurisdiction in New York was secured by the service of a warrant of attachment against the properties of the defendant. Approximately $41,000 was involved, the Starring Company filing a bond conditioned that if the Hamilton Gas Company should recover judgment in the amount of attachment, it would pay all costs. Motion was made to vacate the attachment, which was denied. The case was brought to trial after the institution of the New York receivership,

and resulted in final judgment on behalf of the Hamilton Gas Company, the surety becoming liable for the full amount of the bond. This Court authorized the assignment of all right under the bond to Smyth & Tuttle, the latter releasing the estate of the debtor company in these proceedings for their claim in the amount of $2,566.28. Later, Starring was permitted to continue that action against the Receivers, and the Receivers were authorized by the New York District Court to employ this firm to defend the action. A further allowance in this matter of $1,500 should be made, $126.-82 expenses being also allowed.

The following sums are asked on behalf of representation of the debtor, respectively as compensation and expenses:

| | | |
|---|---|---|
| W. A. Larner, President of Debtor | $15,000.00 | $ 5,861.85 |
| Frank Lively, of counsel for Debtor | 1,200.00 | 90.04 |
| Smyth & Tuttle, counsel for Debtor | 30,000.00 | 2,969.97 |
| Total of amounts asked (including expenses) | | $55,121.86 |

It must be borne in mind that Mr. Larner, as President of the debtor, and the attorneys for the debtor, are not claiming services rendered at the inception of the receivership proceeding. Mr. Larner is claiming such services as Delaware Receiver. At the inception of a bankruptcy proceeding, occasions may arise where allowance may be made for assistance in placing the estate of the bankrupt in the hands of the officers of the court, preservation of the estate, collecting information, etc. Such is not the situation here presented. As a matter of fact, the Trustees in their testimony indicated, particularly in the case of the testimony of Mr. McCue, that helpful assistance was not rendered by Mr. Larner. His services as President of the debtor are claimed from the inception of the 77B proceedings, or a few days prior thereto, the first item from the blotter entries of Smyth & Tuttle being dated June 5, 1934. At that time, the property and full conduct of the business of the debtor had been in the hands of the receivers in the foreclosure proceeding for more than two and one-half years. Immediately following the filing of the 77B proceedings in this Court, the debtor filed a petition under that section in New York, obtaining an order later modified, requiring the receivers in West Virginia to turn over the property. The long jurisdictional conflict followed, resulting in more than a year's delay in consummating the plan of reorganization. That jurisdictional dispute turned on the location of the principal place of business of the debtor—a fact peculiarly within the knowledge of the officers of the debtor. It is argued that the debtor had the right to be heard in this particular; that all of its assets had been taken over by the Court, and that it had no funds with which to compensate counsel. Such may be true, although it is a matter of general knowledge that frequently the real parties in interest in such cases are the stockholders of the debtor corporation. However, the activities in opposing the jurisdiction of this court did not contribute to the plan of reorganization consummated; on the contrary, they were necessarily obstructive to it. In however good faith they may have been instituted, or however much the establishment of the New York jurisdiction may have been in accordance with the desires of the debtor, under no possible conception of the situation can they be considered in furtherance of, and beneficial to, the plan that was consummated. Likewise, it has been adjudicated in this Court that there was no equity for the debtor, and a great expense was imposed on the security holders that were entitled to participate in the estate by these activities. Certainly, these services, however extensive, form no basis for allowance from the estate, which estate belongs in equity to the bondholders and creditors.

After the settlement of the jurisdictional controversy, the president of the debtor and his attorneys were most active in seeking so to reorganize the company that the stockholders might have some participation, in opposing various plans, particularly that of the Harper Committee, in numerous conferences, aiding in the organization of the Craigmyle Committee, and in various other activities chiefly in opposition to the plan. They were also active upon the issue of whether the company was insolvent or not. It must be remembered that all of these activities were on behalf of the debtor corporation, which had been adjudicated by this Court as insolvent, an adjudication that after appeal and remand was again confirmed and became final. It is recognized that it is difficult for men interested in a company to give up all hope of salvaging anything from their investment. Certainly, it is

within their rights that they take every proper step to attempt to salvage such investment. Here counsel for the debtor performed numerous and efficient services, but all of those services were for the debtor who actually had no equity in the property. No allowance to them would be proper from funds that belong to creditors. Their efforts had the effect of delaying, and not furthering, the consummation of the plan. These applicants stand upon the same ground and are met with the same legal bar, as in the case of committees, and those representing committees, of stockholders, and no allowances can be made. In re National Lock Co., 7 Cir., 82 F.2d 600.

### Claim of Manufacturers Trust Company and Counsel.

The Manufacturers Trust Company seeks an allowance of $896.14 on account of expenses, the amount originally requested consisting of two items of $1,079.29 and $484.47, but having been reduced at the hearing through the withdrawal of certain parts of the claim (see Transcript of Record, page 272). The Manufacturers Trust Company was a creditor of the debtor corporation in a large amount, holding bonds as collateral to secure such indebtedness. During the course of the litigation, it appearing that the value of the bonds held as collateral exceeded the value of the debt, the Trustees were directed to pay in full this indebtedness and take up the bonds and such was done.

As to the items of expense by the Bank, $411.67 represents one-half of the costs of appeal from the District Court to the Circuit Court of Appeals on the jurisdictional question, the Manufacturers Trust Company having intervened in seeking to uphold the New York jurisdiction. On reversal of the District Court, a judgment for costs was entered against the Trust Company. There is an item of $434.-37 for sending witnesses to Charleston for court hearings, and there is an item of $50 expense in connection with the report of Special Master Broun.

With respect to a considerable portion of these expenses, it appears, therefore, that they related to the jurisdictional dispute, the Trust Company being unsuccessful in this particular. The disallowance of such part of the expenses would necessarily follow from the discussion heretofore had with respect to claims of attorneys arising from the jurisdictional dispute; but there are further reasons for the disallowance of this, as well as the residue, of these claims.

Mr. Morse, representative of the Bank, in answer to a question as to whether the Manufacturers Trust Company had any interest in this litigation other than the collection of its debt, answered that, technically, it had no other interest, but actually "it was pushed into it" in a representative capacity; further stating that the Bank is a large financial institution and that it had received a great many inquiries from customers of the Bank, depositors, with respect to securities which those customers held in the debtor corporation, and that it felt it owed a duty to such depositors, and, accordingly, it was, in effect, a representative, in an informal way, of a great many people who had voiced their objections to the Bank. Mr. Morse affirmed that the Trust Company appears in the record solely as a creditor and as an intervener; that its petition and all allegations and testimony went to the collection of its own debt, which was an ordinary debt, except secured by collateral, and that it had no relationship to the record in this cause otherwise than as an individual creditor seeking to collect its debt. So far as the representative capacity of the bank noted by Mr. Morse is concerned, it is not claimed that such was more than informal.

A relationship of this character doubtless is present in virtually any extended litigation in which large financial institutions, with customers interested, are involved. A customer interest of this nature, so far from being the basis for allowance, even in the case of brokers who are members of committees formally appearing, is a deterrent to allowance. That principal which prevents a party from receiving allowance generally from the estate, where his activity or representation only relates to a personal or group interest, extends to a so-called customers' interest. Certainly the fact that the Manufacturers Trust Company, appearing on the record solely upon its own behalf, might have had customers who were looking to it for advice and guidance furnishes no basis for an allowance. Primarily and fundamentally, the Trust Company throughout this record appears, and in fact was, a private litigant, seeking to collect its own debt. Obviously, a proper basis for allowance is not presented in such a situation.

Counsel for the Trust Company rely largely upon In re Consolidated Motor Parts, 2 Cir., 85 F.2d 579. In that case the applicant was an attorney for creditors, and it is pointed out that if he had been counsel for a creditors' committee and had rendered substantial services in preparation of a plan of reorganization, he would have come within the category of cases permitting allowance. It is further stated in the opinion that he seemed to be the very person who brought about the non-discriminatory plan which finally prevailed in that litigation. I can see no parallel between the facts in that situation and those here present. Counsel for the Trust Company further rely on the case of In re Paramount Publix Corporation, 2 Cir., 85 F.2d 588, in which it is stated that in the absence of an adequate representation of an interest, compensation may be awarded even in the case of individual representation, but, only under unusual circumstances should any one other than a committee representing a substantial percentage of creditors or stockholders be awarded compensation. Here there was extensive representation of security holders by committees. The position of the Manufacturers Trust Company, so long as it held bonds as collateral, was essentially that of a bondholder. In brief of counsel, it is pointed out, however, that the Trust Company, in opposing the original plan of the Harper Committee, undoubtedly prevents its being "forced through" to the detriment of the creditors and bondholders of the debtor, and that the services of counsel for the Trust Company resulted in a far better plan being adopted, and, while it is true that such services were rendered primarily for the benefit of the Trust Company, as a matter of fact, the entire reorganization had been improved as a result. Summarizing this argument, it is somewhat to the effect that the Trust Company, in the early stages of the litigation, "held the situation together," as it were, until the coming of the Craigmyle Committee, in which opposition to the Harper plan was later focused. In the first place, such a position represents an assumption that the Court cannot accept. Certainly, such bondholders who later opposed the Harper plan were vigilant. Mr. Craigmyle testifies that during the period from 1932 to the time of the first Harper plan, proposed in June, 1934, he had conferences with Mr. Harper in reference to such plan. It must be remembered that the Harper plan was dated June 21, 1934. Mr. Craigmyle further testifies that so soon as the plan of that date was promulgated, it was evident that there were certain defects which he discussed with Mr. Benjamin, Mr. Van Alstyne and the Manufacturers Trust Company and many other bondholders. It appears from this testimony that the Trust Company from the inception of the Harper plan was advised of the interest and activity of Mr. Craigmyle and the other bondholders. Immediately following the promulgation of this plan, the jurisdictional controversy arose, and any definite steps towards carrying out any plan of reorganization were held in abeyance. Upon the disposal of the jurisdictional question in the summer of 1935, the Craigmyle Committee was formally organized. It is clear that at no time and nowhere in the train of events did the Manufacturers Trust Company "hold the situation together" in opposition to the Harper plan through its individual efforts, even if such act upon its part would have rendered its claim for allowance compensable. Such indirect contribution, had there been such, in any event would have been remote and indirect, and not in accordance with the rule laid down In re Consolidated Motor Parts, Inc., supra, but contrary to the following language of that opinion, 85 F.2d at page 581: "It is not every service that may in some remote degree contribute to the general welfare of the proceeding that the court is bound to compensate under this section of the statute. If it were, the very purpose of the statute would in many cases be frustrated."

If the Manufacturers Trust Company had represented formally a group of bondholders, such representation would necessarily have been in duplication of the work of the Harper and Craigmyle Committees, unless, of course, it supplanted one or the other. Many other reasons and authorities could be cited against the allowance of this claim, but, reduced to its simplest terms, it seems clear to me from the record that the activities of the Manufacturers Trust Company were primarily because of its interest in the collection of its own debt, and it is obvious that under such circumstances allowance may not be made to it. It follows that no allowance may be made to its attorneys. So far as the record discloses, they have ably and efficiently represented their clients and that client,

in the course of the litigation, collected in full its very large debt, with full interest. Certainly, for these services these attorneys would appear well entitled to compensation, but for these services, and, a fortiori, for reimbursement for their expenses, they must look to the client for compensation.

### Specially Designated Counsel of West Virginia Trustees.

Stanley C. Morris and William E. Miller have filed a claim for $2,000 compensation and $302.80 expenses, as special counsel for debtor and Trustees in the litigation with R. C. Hutchinson et al., and also a supplemental petition for additional out-of-pocket expenses of $50.65. They were heretofore appointed such Special Counsel by order of the Court. The Hutchinson litigation involves certain questions with respect to leases in which the debtor corporation was interested. Legal and factual complexities are present. Counsel for the Trustees in their brief express the opinion that the amount claimed of $2,000 for compensation is entirely reasonable, and that the expenses of $302.80 are proper. In this opinion, the Court concurs and these amounts will be allowed, including the additional expense item of $50.65.

Stanley C. Morris and William E. Miller have filed an original claim for $10,000 compensation and reimbursement of $1,310.51 for expenses, as Special Counsel in the matter of the claim of the debtor corporation against Inland Gas Corporation; also a first supplemental claim for "further compensation for services since December 1, 1937" and $67.08 out-of-pocket expense, and a second supplemental claim filed February 21, 1938 for additional out-of-pocket expenses amounting to $24.33. These gentlemen were specially designated to appear as counsel in this matter and there is, of course, no question as to the propriety of some allowance being made to them. Counsel for the Trustees in their brief so concede, confining, and I believe, properly, their consideration merely to the quantum of the fee requested. They further state that probably the amount, when requested, was predicated upon the assumption that funds would be brought into Court which, they state, now appears doubtful, and they further state that in all probability it will be recognized that under the present circumstances the fee is too large.

These gentlemen were designated as Special Counsel in this matter by order of the Court entered September 8, 1936. In their original petition, it is stated that Mr. Morris devoted approximately 158 hours and Mr. Miller 320½ hours to this matter. A full statement as to this claim and the three petitions is unnecessary. Primarily, it is for the failure of the Inland Gas Company to take gas for which it had contracted, the amount of damages claimed being in a very large amount. The Inland Company, for many years in the hands of a receiver or trustee, was engaged in operations in Kentucky. This claim involved not only the primary questions of establishing liability and fixing the amount of damages, but the secondary and important question of collectibility, the Inland Gas Company having a very large secured mortgage indebtedness. Under these circumstances, and chiefly because of the question of collectibility of the indebtedness, this Court approved an agreement of compromise whereby $54,000 was to be paid upon the claim. Subsequently, institution of litigation on behalf of the Inland Company was authorized by the Kentucky Court against independent companies, the amount claimed being in a very large sum. Meanwhile, the compromise has not been consummated. I am not fully advised as to the present status of the matter, but the approval of such compromise by the Kentucky Court, possible recovery on behalf of the Inland Company in its litigation, the question as to whether this be a preferred claim as an equitable prior lien to the first mortgage or a preferred claim against the Inland receiver, in light of the adjudications in Kentucky, are important factors, as I understand, bearing upon the situation. This Court refused to withhold this claim in the reorganization from the reorganized company. The future course of this claim in the hands of the reorganized company may or may not justify further compensation by that company. With this the Court has no concern. Its allowance can only go to the activities of these attorneys while the claim was in litigation under the orders of this Court. In view of the uncertain status at the time it was turned over to the reorganized company, in my opinion, the amount asked for of $10,000 fixed at a time when, in all probability, it was expected that funds would be brought into court in the immediate future, is too high and a proper allowance for such services would be $3,000.

The expense accounts of $1,310.57 and $67.08 and $24.38 are proper and are allowed.

In conclusion, it is to be remembered that the original suit in Delaware, wherein Receivers were appointed, and the ancillary suits in West Virginia and other states, wherein Receivers were appointed, were instituted by creditors against the Hamilton Company. This Company, at that moment, as it was subsequently shown, was insolvent in the ordinary and legal meaning of the word, and then had only fifty-nine dollars in the treasury. Immediate action to protect the properties of the company was absolutely necessary.

It is to be further remembered that the Trustees in the mortgage instituted the suit in equity in this court in the month of August, 1932, to enforce the provision of such mortgage in reference to the defaults thereunder, and that such suit was a primary, independent one.

Proper orders were entered transferring to the Receivers in this suit all the properties of every kind belonging in the Hamilton Company and sequestering all of its income. From such last-named date the Receivers in the Delaware suit were functus officio, so far as the properties in West Virginia were concerned.

Later proper action was had in this primary suit to marshal the debts of the Company of every kind and to sell its properties to pay the same. This was the condition of affairs when the 77B Section was passed and the proceedings thereunder were instituted.

It is further to be remembered that outside of two instances hereinbefore mentioned, all the alleged work of counsel and committees, for which they claim sums due them as fees, was done, and all expenses were incurred, without the knowledge and consent of this Court and without any report to this Court of their various actions, and that there was never any approval thereof by this Court.

It is further to be remembered that all these committees were self-appointed, and, in some instances, at least, the counsel representing them appear to have selected the personnel thereof.

To summarize, the following amounts of compensation and expenses, respectively, will be allowed:

| | Compensation | Expenses |
|---|---|---|
| Chase National Bank (Trustee) | $ 2,000.00 | $ 130.21 |
| Milbank, Tweed, Hope & Webb | 4,000.00 | 613.74 |
| Steptoe & Johnson (as counsel for First Mortgage Trustee)... | 6,000.00 | ——— |
| Harper Committee | 16,000.00 | 29,283.72 |
| White & Clapp | 22,000.00 | 193.86 |
| (plus $5000 already paid) | | |
| Steptoe & Johnson (as counsel for the Harper Committee and Petitioning Creditors) | 32,500.00 | 2,130.10 |
| (plus $5000 paid) | | |
| Craigmyle Committee | 5,500.00 | 3,854.09 |
| Hines, Rearick, Dorr & Hammond | 17,500.00 | 1,380.43 |
| Rummel, Blagg & Stone | 2,500.00 | 140.29 |
| Watters Committee | 10,000.00 | 5,212.59 |
| Hepburn & Norris | 15,000.00 | ——— |
| Jamieson Committee | 500.00 | ——— |
| George Pfeil | 200.00 | 200.00 |
| A. C. Hindman | ——— | 200.00 |
| Tompkins, Boal & Tompkins, R. E. O'Connor and A. G. Thompson | 2,400.00 | 1,718.73 |
| A. F. Crichton, as Receiver in Delaware | 250.00 | ——— |
| Richards, Layton & Finger | 500.00 | 89.09 |
| Frank L. Speakman | 50.00 | ——— |
| Smyth & Tuttle (as counsel for (Delaware Receivers) | 2,000.00 | 716.74 |
| Irving Trust Company, as Receiver in New York | 250.00 | ——— |
| Smyth & Tuttle, for special service, New York receivership | 1,500.00 | 126.82 |
| S. C. Morris and W. E. Miller, as Special Counsel in re R. C. Hutchinson litigation | 2,000.00 | 302.80 |
| S. C. Morris and W. E. Miller, as Special Counsel in re Inland Gas Corporation | 3,000.00 | 1,402.03 |
| Total | $145,750.00 | $47,695.24 |

An order may be presented to the Court in accordance herewith.